1  BRIAN L. JOHNSRUD, State Bar No. 184474
2  JENNIFER LOTZ, State Bar No. 196925
   CURLEY, HURTGEN & JOHNSRUD LLP
   4400 Bohannon Drive, Suite 230
3  Menlo Park, CA 94025
   Telephone:   650.600.5300
4  Facsimile:   650.323.1002
   E-mail:  bjohnsrud@chjllp.com
5            jlotz@chjllp.com

6  Attorneys for Defendant
   JUUL LABS, INC.
7

8                  UNITED STATES DISTRICT COURT

9              FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11  MARCIE HAMILTON,                      Case No. 3:20-CV-3710-EMC

12              Plaintiff,                **DECLARATION OF BRIAN L.
                                          JOHNSRUD IN SUPPORT OF
13        v.                              DEFENDANT JUUL LABS, INC.'S
                                          MOTION TO DISMISS FOR FAILURE
14  JUUL LABS, INC.,                      TO STATE A CLAIM AND MOTION TO
                                          STRIKE (F.R.C.P. 12(B)(6) AND 12(F))**
15              Defendants.
                                          DATE:    August 20, 2020
16                                        TIME:    1:30 p.m.
                                          DEPT:    Courtroom 5, 17th Floor
17                                        JUDGE:  Hon. Edward M. Chen

18

19

20        I, Brian L. Johnsrud, declare and state as follows:

21        1.      I am an attorney duly licensed to practice law in the state of California.  I am a

22  partner at the law firm of Curley, Hurtgen & Johnsrud LLP, and am one of the attorneys

23  representing JUUL Labs, Inc. ("JLI") in this matter.  I have direct and personal knowledge of the

24  facts set forth herein, and, if called as a witness, I could and would competently testify to these

25  facts.

26        2.      Attached hereto as **Exhibit A** is a true and correct copy of the Senate Judiciary

27  Committee Bill Analysis of Senate Bill 1300 (as amended April 4, 2018) from the April 17, 2018

28  hearing, which is available at

Curley, Hurtgen &
Johnsrud llp
Counselors At Law
Menlo Park

1

DECL. OF BRIAN L. JOHNSRUD ISO DEF.'S MTN.
TO DISMISS & MTN. TO STRIKE
(CASE NO. 3:20-CV-3710-EMC)

1  http://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=201720180SB1300 at the

2  link for 04/16/2018 – Senate Judiciary.

3       I declare under penalty of perjury under the laws of the State of California and the United

4  States of America that the foregoing is true and correct.  Executed this 9th day of July 2020, at

5  Menlo Park, California.

6

7                                            ___/s/  Brian L. Johnsrud__
                                             Brian L. Johnsrud

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Curley, Hurtgen &
Johnsrud llp
Counselors At Law
Menlo Park                    2                    DECL. OF BRIAN L. JOHNSRUD ISO DEF.'S MTN.
                                                   TO DISMISS & MTN. TO STRIKE
                                                   (CASE NO. 3:20-cv-3710-EMC)

# EXHIBIT A

**SENATE JUDICIARY COMMITTEE**
**Senator Hannah-Beth Jackson, Chair**
**2017-2018 Regular Session**

SB 1300 (Jackson)
Version: April 4, 2018
Hearing Date: April 17, 2018
Fiscal: Yes
Urgency: No
TSG

## SUBJECT

Unlawful employment practices:  discrimination and harassment

## DESCRIPTION

This bill would make a series of changes to the Fair Employment and Housing Act designed to strengthen that statute's deterrent effect against discrimination, harassment and retaliation. Specifically, the bill would: (1) provide guidance to the courts on application of the legal standard for unlawful harassment;  (2) make employers liable if they fail to take all reasonable steps to try to stop unwelcome, potentially harassing conduct from becoming so severe and pervasive as to meet the legal definition of harassment; (3) establish that employers may be held liable for unlawful harassment that their employees endure, based on any protected characteristic, at the hands of third-party non-employees, if the employer knows of the harassment, has the requisite control over the situation, and fails to correct it; (4) restrict the use of contractual provisions that require workers to waive their civil rights as a condition of employment or continued employment; (5) prevent the preemptive use of contractual non-disparagement clauses, at the time of hire or as a condition of continued employment, to deny employees the right to disclose information about unlawful acts in the workplace, including sexual harassment;  (6) expand the scope and content of workplace sexual harassment prevention training;  and (7) clarify that people seeking to enforce their civil rights in good faith, including the right to be free from sexual harassment, should not be deterred by the concern that they may be forced to pay attorneys' fees.

## BACKGROUND

The legal standards that prohibit sexual harassment in workplace, business, professional, service, and other contexts originated over 30 years ago. They emerged from anti-discrimination laws that date back even further. Yet, as the events of 2017 have made abundantly clear, sexual harassment remains commonplace. Victims still suffer life-altering professional, psychological, and economic impacts. To try to avoid becoming victims, women must still remain constantly vigilant and still often choose to alter their own conduct and forgo opportunities in order to stay safe. In this way, sexual harassment continues to systematically undermine the ability of women and other

SB 1300 (Jackson)
Page 2 of 28

vulnerable groups to thrive professionally, economically, and emotionally, on an equal basis with all others.

In response, this Committee and other state Legislative bodies have conducted numerous hearings, consulted with experts, and listened to public commentary with the goal of identifying legal reforms that would help to ensure a serious and lasting end to the scourge of harassment.

These public inquiries and conversations have revealed that a series of legal and policy shortcomings have enabled and, in some cases, have even facilitated harassment. Those shortcomings include: overly permissive tolerance for legal tactics that silence victims; insufficient and ineffective sexual harassment prevention training requirements; failure on the part of some judges to fully account for the power of sexual harassment to undermine the civil rights of its victims; and standards for liability that force victims to endure unwelcome conduct to the point where it becomes severe or pervasive before they are entitled to any remedy.

Sexual harassment is the result of many factors operating together. No one change in the law is likely to disrupt the persistence of harassment. Accordingly, this bill takes a multi-pronged approach. It would make a number of modifications to the Fair Employment and Housing Act, each intended to address a different identified shortcoming in the existing law. The Comments to this analysis, below, detail these modifications and the corresponding problems they are intended to address, one by one. Taken as a whole, however, these reforms may be characterized as closing loopholes in existing harassment law, strengthening sexual harassment prevention training requirements, and cracking down on the use of contractual provisions which prevent victims from speaking out and shield serial harassers against accountability.

## CHANGES TO EXISTING LAW

1. Existing law provides that an employer may be liable for workplace *sexual* harassment of an employee, applicant, unpaid intern or volunteer, or person providing services pursuant to a contract, by a non-employee, if the employer knows or should have known of the conduct and fails to take immediate and appropriate corrective action. (Gov. Code Sec. 12940(j)(1).)

   This bill would provide that employers may also be liable for harassment by a non-employee that is based on the victims' race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, genetic information, marital status, sex, gender, gender identity, gender expression, age, sexual orientation, or military and veteran status.

2. Existing law makes it an unlawful employment practice for an employer, labor organization, employment agency, apprenticeship training program, or any training

program leading to employment, to fail to take all reasonable steps necessary to prevent discrimination and harassment from occurring. (Gov. Code Sec. 12940(k).)

Existing law holds that, as a precondition for prevailing on a cause of action for failure to take all reasonable steps to prevent discrimination and harassment from occurring, a plaintiff must first show that the alleged conduct was sufficiently severe or pervasive to meet the legal definitions of discrimination or harassment. (*Dickson v. Burke Williams, Inc.* (2015) 234 Cal.App.4th 1307, 1314; (*Trujillo v. North County Transit Dist.* (1998) 63 Cal.App.4th 280, 289.))

This bill would specify that a plaintiff in an action alleging failure to take all reasonable steps to prevent discrimination and harassment is not required to prove that the plaintiff endured conduct that meets the legal standard for harassment or discrimination. Instead, it would suffice for the plaintiff to show that the employer knew that the conduct was unwelcome to the plaintiff, that if the conduct increased in severity or became pervasive it would meet the legal standard for harassment or discrimination, and that the defendant failed to take all reasonable steps to prevent the same or similar conduct from recurring.

3. Existing law defines harassment as discriminatory conduct unwelcome to the plaintiff that is sufficiently severe or pervasive as to create a hostile, abusive environment and interfere with the terms and conditions of employment. (*Miller v. Department of Corrections* (2005) 36 Cal.4th 446, 462.)

This bill would express the Legislature's intent regarding the application of the legal standard for sexual harassment. Specifically, it would:

- state that the purpose behind the laws against harassment is to provide all Californians with an equal opportunity to succeed in the workplace and that anti-harassment laws should be applied accordingly;
- declare that harassment creates a hostile, offensive, oppressive, or intimidating work environment and deprives victims of their statutory right to work in a place free of discrimination when the harassing conduct sufficiently offends, humiliates, distresses or intrudes upon its victim, so as to disrupt the victim's emotional tranquility in the workplace, affect the victim's ability to perform the job as usual, or otherwise interfere with and undermine the victim's personal sense of well-being;
- provide that a single incident of harassing conduct is sufficient to create a triable issue regarding the existence of a hostile work environment if the harassing conduct unreasonably interfered with the plaintiff's work performance or created an intimidating, hostile, or offensive working environment;
- affirm that courts should examine the totality of the circumstances when weighing whether or not a hostile environment existed, without disregarding any potential evidence on the grounds that it is merely a stray remark uttered by someone without decision-making authority;

- specify that the legal standard for sexual harassment should not vary by type of workplace; that it is irrelevant whether a particular occupation may have been characterized by a greater frequency of sexually related commentary or conduct in the past; and that in determining whether or not a hostile environment existed, courts should only consider the nature of the workplace when engaging in or witnessing prurient conduct and commentary is integral to the performance of the job duties; and
- indicate that harassment cases are seldom appropriate for disposition on summary judgment.

4. <u>Existing law</u> obligates public and private sector employers with 50 or more employees or using the services of 50 or more independent contractors, to provide at least two hours of classroom or other effective interactive training and education regarding sexual harassment to all *supervisory* employees in California within six months of their assumption of a supervisory position and once every two years. (Gov. Code Sec. 12950.1(a).)

<u>Existing law</u> mandates the required education and training must be presented by trainers or educators with knowledge and expertise in the prevention of harassment, discrimination, and retaliation, and must include:
- information and practical guidance regarding the federal and state statutory provisions concerning the prohibition against and the prevention and correction of sexual harassment and the remedies available to victims of sexual harassment in employment;
- practical examples aimed at instructing supervisors in the prevention of harassment, discrimination, and retaliation;
- a component on the prevention of "abusive conduct," defined as conduct of an employer or employee in the workplace, with malice, that a reasonable person would find hostile, offensive, and unrelated to an employer's legitimate business interests; and
- a component inclusive of harassment based on gender identity, gender expression, and sexual orientation. (Gov. Code Sec. 12950.1(a-c).)

<u>This bill</u> would obligate covered employers to provide the required training to *all* employees.

<u>This bill</u> would expand the scope of employers subject to the requirement to provide sexual harassment prevention training from all employers with 50 or more employees or independent contractors, to all employers with five or more employees.

<u>This bill</u> would require covered employers, as part of the required two hour education and training, to:

- include bystander intervention training with information and practical guidance on how to enable bystanders to recognize potentially problematic behaviors and to motivate bystanders to take action when they observe problematic behaviors;
- include exercises to provide bystanders with the skills and confidence to intervene as appropriate and would have to provide bystanders with resources they can call upon that support their intervention; and
- provide information to each employee on how and to whom harassment should be reported as well how to contact the California Department of Fair Employment and Housing to make a complaint regarding a violation of workplace sexual harassment education and training requirements.

5. <u>Existing law</u>, in the context of contractual obligations, provides that all of the following are unlawful: that which is contrary to an express provision of law; that which is contrary to the policy of express law, though not expressly prohibited; or that which is otherwise contrary to good morals. (Civ. Code Sec. 1667.)

<u>Existing law</u> makes unlawful all contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent. (Civ. Code Sec. 1667.)

<u>Existing law</u> gives discretion to the courts to refuse to enforce any contract or clause of a contract if the court determines, after affording a reasonable opportunity to the parties to present the contract's commercial setting, purpose and effect, that the contract or clause of the contract was unconscionable as a matter of law at the time it was made. (Civ. Code Sec. 1670.5.)

<u>This bill</u> would make it an unlawful employment practice for an employer, in exchange for a raise or bonus, or as a condition of employment or continued employment, to do either of the following:

- require an individual to sign a release of a claim or right under the Fair Employment and Housing Act, including a statement that the individual does not possess any claim or injury against the employer or other covered entity, and including a release of a right to file or pursue a civil action or complaint with, or otherwise notify, a state agency, other public prosecutor, law enforcement agency, or any court or other governmental entity; or
- require an employee to sign a nondisparagement agreement or other document that purports to deny the employee the right to disclose information about unlawful acts in the workplace, including, but not limited to, information pertaining to sexual harassment or any other unlawful or potentially unlawful conduct.

6. <u>Existing law</u> gives courts the discretion to award reasonable attorneys' fees and costs, including expert witness fees, to a plaintiff who prevails on a claim for

workplace discrimination, harassment, or retaliation, among other civil rights violations under the Fair Employment and Housing Act. (Gov. Code Sec. 12965(b).)

Existing law provides that if, during the course of litigation, one party makes a settlement offer, that offer is refused, and the recipient of the offer then fails to obtain a better result at trial, then the party that made the settlement offer is entitled to an award of all attorneys' fees and costs incurred from the time the settlement offer was rejected. (Code Civ. Proc. Sec. 998.)

Existing law is unsettled as to whether a plaintiff who rejects a settlement offer in an action alleging workplace discrimination, harassment, or retaliation, may be subject to paying the subsequently incurred attorneys' fees and costs of the defendant if the plaintiff does not obtain a result that is more favorable than the settlement offer was. (*Compare Sviridov v. City of San Diego* (2017) 14 Cal.App.5th 514, *to Arave v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, (4th Dist., Div. 2 Jan. 2, 2018) Case No. E061677.)

This bill would clarify that a prevailing defendant shall not be awarded attorneys' fees and costs in an action under the Fair Employment and Housing Act, irrespective of the rejection of any offers of settlement, unless the court finds the action was frivolous, unreasonable, or totally without foundation when brought, or that the plaintiff continued to litigate after the action clearly became so.

## COMMENT

1. Stated need for the bill

According to the author:

> Beginning in 2017, propelled by movements such as #MeToo and #WeSaidEnough, brave women began coming forward and exposing the prevalence of sexual harassment in the workplace. Along with showcasing how common sexual harassment is across industries and the harm it afflicts on victims' emotional well-being, their careers and earnings, these stories shed light on the complex legal and cultural factors that enable sexual harassment to occur unchallenged in the workplace.

> As a result of these movements, a number of powerful perpetrators were subsequently exposed and fired. Yet as important as it is to hold perpetrators accountable, it has become clear that preventing sexual harassment in the workplace must involve more than that. Enabled by our work cultures and our legal environment, moving toward a harassment-free culture in California will require a host of meaningful policy and legal reforms that allow victims to seek justice, know their rights, and speak out about abuse.

SB 1300 (Jackson)
Page 7 of 28

> SB 1300 seeks to comprehensively address harassment in the workplace by prohibiting legal tactics that prevent victims from speaking out about abuse and seeking justice; strengthening sexual harassment training; holding employers accountable to their duty to prevent harassment; and providing guidance to the courts to ensure that the "severe or pervasive" legal standard is fairly applied to protect victims.

As sponsors of the bill, the California Employment Lawyers' Association and Equal Rights Advocates jointly write:

> In recent months, sexual harassment has gained long-overdue attention as a large number of women (and some men) have come forward about their experiences with sexual harassment in the workplace.  As we have learned from the many stories that have come to light, our laws have too often failed to protect workers from the kind of sexual harassment and discrimination that they were designed to prevent. […]

> Our lawyers have found that there are significant gaps in the FEHA that have denied justice to victims of sexual harassment, that have allowed sexual perpetrators to evade its reaches, and that have generally allowed sexual harassment in the workplace to persist. SB 1300 addresses these gaps in the law by proposing several important reforms. […]

> With this kind of strengthened training on sexual harassment prevention, intervention, and reporting, we can help eradicate sexual harassment and create healthier and safer places to work.

> SB 1300 takes a comprehensive approach to addressing sexual harassment and provides a framework for strengthening our existing laws and training requirements, and ensuring that these rights cannot be contracted away by deceptive legal agreements.

In support of the bill, the American Civil Liberties Union of California writes:

> SB 1300… addresses the pervasive problem of sexual harassment by holding employers accountable, giving employees better tools to speak out about abuse, and providing courts with clarity in cases of "severe or pervasive" work-related harassment. Many of these important legal changes will help not only those who experience sexual harassment but also people who experience other forms of bias-based harassment and discrimination in the workplace as well.

SB 1300 (Jackson)
Page 8 of 28

## 2.  Concerns expressed about the bill

In opposition to the bill, the California Chamber of Commerce and 35 affiliated organizations write:

> [SB 1300] would remove the legal standing requirement for specific Fair Employment and Housing claims and limits the use of nondisparagement agreements and general releases, these provisions will significantly increase litigation against California employers and limit their ability to invest in their workforce.

These and other concerns raised by opponents of this bill are detailed in the corresponding Comments on the bill, below.

## 3.  The legal standard for workplace harassment

Although, colloquially, the term "harassment" is frequently used to describe a wide range of unwelcome behavior, in the legal sense, "harassment" has a far narrower and more precise definition. In other words, despite the common misconception that people can successfully sue others for any sort of behavior that the target perceives to be harassing, in fact people can only successfully sue for very specific and relatively extreme forms of behavior that meet the legal standard of harassment.

Currently, that legal standard may be summarized as follows: to prevail on a harassment claim, the plaintiff must show that the conduct was *unwelcome, discriminatory, and reached the level of becoming "severe or pervasive."* (*Miller v. Department of Corrections* (2005) 36 Cal.4th 446, 462.)

That the conduct must be *unwelcome* means that the victim did not solicit or incite the conduct and that the conduct was undesirable or offensive to the victim. (*EEOC v. Prospect Airport Servs., Inc.* (9th Cir 2010) 621 F3d 991, 997.) For legal purposes, conduct may be unwelcome even if the harasser does not know or intend it to be so; whether or not conduct is unwelcome is judged subjectively from the point of view of the victim. (*Ellison v. Brady* (9th Cir 1991) 924 F2d 872, 880.)

To constitute harassment in the legal sense, the unwelcome conduct must also be discriminatory. That the conduct must be *discriminatory* means that it must have treated the victim differently on account of the victim's race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, genetic information, marital status, sex, gender, gender identity, gender expression, age, sexual orientation, or military and veteran status. (Gov. Code Sec. 12940(j)(1).) This nexus requirement means that ridiculing, teasing, or abusive comments are not harassment in the legal sense unless they are made on account of one of the restricted bases. Thus, it is *not* potential harassment, legally speaking, if you demean other people for the sports teams they like, for their taste in music, for being a hippie, or for how often they play

golf, but it *is* potentially harassment, legally speaking, if you ridicule others because they are female, or gay, or HIV positive, or because they served in Iraq or Afghanistan.

Conduct that is both unwelcome to the victim and discriminatory is well on its way to being harassment in the legal sense, but it is not there yet. There is an important, final, legal ingredient. To constitute harassment in the legal sense, the conduct must be unwelcome and discriminatory, *and* it must *reach the point of becoming "severe or pervasive,"* meaning that it must "alter the conditions of employment and create a work environment that qualifies as hostile or abusive to employees." (*Miller v. Department of Corrections* (2005) 36 Cal.4th 446, 462.) Discriminatory, unwelcome conduct that is, by contrast, only "occasional, isolated, sporadic, or trivial" generally fails to meet this standard. (*Lyle v. Warner Brothers Television Productions* (2006) 38 Cal.4th 264, 283.) The test is both subjective and objective; that is, the plaintiff must experience the discriminatory conduct as severe or pervasive and a reasonable person would also have to find it to be that way. In California, the objective element must be evaluated from the point of view of a reasonable person in the plaintiff's position. (*Ellison v. Brady*, *supra*, 924 F.2d 872, 878.) In the context of sexual harassment, this is sometimes referred to as "the reasonable woman" standard, given that the majority of sexual harassment plaintiffs are female.

Whether the conduct meets the "severe or pervasive" threshold must be evaluated in light of the totality of the circumstances. Factors that the adjudicator should take under consideration include: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." (*Mokler v. County of Orange* (2007) 157 Cal.4th 121, 142.) In the case of sexual harassment, the unwelcome conduct does not have to be motivated by sexual desire to rise to the level of being legally actionable (Gov. Code Sec. 12940(j)(4)(C)), and it may be directed at a member of the same sex. (*Lewis v. City of Benicia* (2014) 224 Cal.App.4th 1519.) The plaintiff does not have to have been the target of the harassment, but adjudicators are supposed to discount conduct that "involves or is aimed at persons other than the plaintiff" as less offensive and severe than conduct targeted at the plaintiff. (*Lyle v. Warner Brothers Television Productions*, *supra*, 38 Cal.4th at pp. 284–285.) Courts have ruled that discriminatory conduct that is not directed at any one person must "permeate" the plaintiff's environment to be actionable as harassment. (*Fisher v. San Pedro Peninsula Hospital* (1989) 214 Cal.App.3d 590, 610.)

4. <u>Providing guidance to the courts on the application of the "severe or pervasive" standard</u>

On January 11, 2018, this Committee, in collaboration with Senate Select Committee on Women, Work, and Families, held an informational hearing to review this legal standard and evaluate whether any modifications are needed to reduce incidents of harassment and better ensure genuine equality of opportunity. While witnesses at the hearing expressed differing opinions, a general point of consensus was that if changes

are needed, those changes relate more to application of the legal standard, rather than to the standard itself. With that in mind, this bill would provide the following guidance to the courts with regard to application of the legal standard for sexual harassment in California:

   a.   *Restoring the focus on the civil rights underpinnings of anti-harassment laws*

Nearly all of the legal doctrines for adjudicating harassment cases trace their origins to a 1986 U.S. Supreme Court case, *Meritor Savings Bank, FSB v. Vinson* (477 US 57). In that case, the court declared for the first time that harassment in the workplace is a form of discrimination and therefore unlawful under Title VII of the Civil Rights Act of 1964. Subsequently, most other courts, state and federal, have looked to *Meritor* and its progeny when evaluating harassment claims brought under anti-discrimination laws.

The focus of Title VII is assuring equal opportunity regardless of race, color, religion, sex, or national origin. (42 U.S.C. 2000e-2(a).) The way that the "severe or pervasive" standard for harassment has been applied in practice can be criticized as straying from both the text and the intent of those laws, however. Perhaps misled by the nature of the phrase "severe or pervasive," courts have too often concentrated on the tort-like question "was the situation really that bad?" when, from the civil rights perspective, the key inquiry is "did the situation undermine equal opportunity?"

This bill would remind the courts of the civil rights origins of harassment law and encourage them to apply that law with an eye toward ensuring that harassment does not deprive Californians of an equal opportunity to succeed.

   b.   *Affirming that a single incident may constitute harassment if sufficiently severe*

California courts have held that a single, severe incident of unwelcome, discriminatory conduct may meet the legal definition of harassment, especially if committed by a supervisor. (*Dee v. Vintage Petroleum, Inc.* (2003) 106 Cal.App.4th 30, 36.) When it comes to co-workers, however, some judges have been reluctant to find that harassment occurred when the claim is based on a single incident.

One case, in particular, seems to have set an especially high bar for such harassment claims. In *Brooks v. City of San Mateo* (9th Cir 2000) 229 F3d 917, a three judge panel led by Judge Kozinski ruled that the plaintiff, a 911 dispatcher, did not have a claim for sexual harassment even though she had been physically assaulted by a co-worker. The court contrasted what the dispatcher endured against another case involving violent overnight confinement and rape. By comparison, the court concluded, the dispatcher "was harassed on a single occasion for a matter of minutes in a way that did not impair her ability to do her job in the long-term." The sponsors of SB 1300 assert that the legacy of this case has been a de facto "one free grope rule" under which even physical assault of a victim is not considered sufficiently severe to support a finding of sexual harassment.

This bill would explicitly reject the holding in *Brooks*, by affirming that a single incident can be sufficient to support a claim of sexual harassment, and would implicitly disavow the "one free grope rule."

 *c. Rejection of the "stray remarks" doctrine; affirmation of totality of the circumstances*

As described above, the general rule is that whether unwelcome, discriminatory conduct rises to the level of unlawful harassment depends on the totality of the circumstances. (*Mokler v. County of Orange* (2007) 157 Cal.4th 121, 142.) Nonetheless, the federal courts have carved out of the totality of the circumstances any consideration of remarks made by non-decisionmaking coworkers or remarks made by decisionmaking supervisors outside of the decisional process, under the so-called "stray remarks doctrine." Such remarks, these courts have ruled, are irrelevant.

In *Reid v. Google, Inc.* (2010) 50 Cal.4th 512, the California Supreme Court addressed whether or not California should follow the federal courts' lead in applying the "stray remarks doctrine." The Court recognized that while stray remarks, viewed in isolation, might not have strong probative value, "they may corroborate direct evidence of discrimination or gain significance in conjunction with other circumstantial evidence." (*Id.*, at 541.)

This bill would affirm the Court's decision in *Reid* and reinforce its guidance to the courts to consider stray remarks as one aspect of the totality of the circumstances on which a claim of harassment is appropriately judged.

 *d. Rejection of "different job, different justice" concept*

Harassment stands as a barrier to equal opportunity. When courts condone unwelcome, discriminatory conduct on the grounds that things have always been that way in a certain industry, they perpetuate the lack of equal opportunity in that industry.

In general, the courts seem to apply the standard for harassment even-handedly across job types. In a few cases, however, there is evidence that courts have allowed consideration of typical jobsite circumstances to influence their assessment of whether particular conduct constitutes unlawful harassment. In *Kelley v. Conco* (2011) 196 Cal.App.4th 191, for instance, the court dismissed an ironworker's claim of sexual harassment, finding that he had not alleged facts sufficient to show that the conduct he endured was "severe or pervasive." In the course of reaching that conclusion, the court remarked that: "in the environment in which this incident took place, sexually taunting comments by supervisors and employees were commonplace, including gay innuendo, profanity, and rude, crude and insulting behavior. Such comments were made both jokingly and in anger." (*Id.* at 205.) In effect, the court seemed to suggest that the ironworker had not suffered harassment and discrimination because harassment and

discrimination were just part of the job environment; part and parcel of what it meant to be an ironworker at this jobsite.

This bill would reject that part of the reasoning and language in *Kelley* that appears to dismiss the harms of harassment and discrimination simply because such harassment and discrimination are commonplace in that jobsite environment. Instead, it would advise the courts that the legal standard for harassment should not, ordinarily, vary by workplace.

At the same time, the bill acknowledges that there are some jobs in which engaging in or witnessing prurient conduct and commentary is *necessarily* part and parcel of the job. In *Lyle v. Warner Brothers Television Productions* (2006) 38 Cal.4th 264, for example, a woman brought a claim for sexual harassment after being exposed to highly sexualized behavior and commentary while working in the writing room for the sitcom "Friends." A unanimous California Supreme Court rejected the woman's assertion that she endured sexual harassment. In doing so, the Court emphasized the fact that the jobsite was "a creative workplace focused on generating scripts for an adult-oriented comedy show featuring sexual themes." (*Id*. at 272.) The bill makes room for such unique circumstances, while still admonishing courts to ensure that the sexualized conduct or commentary is truly integral to the job duties, rather than merely being "the way it is around here."

e. *Discouragement of disposition of workplace harassment claims on summary judgment*

Before any civil legal dispute proceeds to trial, any party may make a motion for summary judgment. When brought by a defendant, such a motion argues, in essence, that even viewing the facts of the case in the light most favorable to the plaintiff, the plaintiff still cannot prevail. When brought by a plaintiff, a summary judgment motion asserts that, even viewing the facts of the case in the light most favorable to the defendant, the defendant still cannot prevail. (Code of Civ. Proc. Sec. 437c(a)(1).) Either way, a motion for summary judgment asks the judge assigned to the case to declare a winner before any trial takes place.

In the context of workplace harassment lawsuits, defendants often seek summary judgment on the ground that, even if everything that the plaintiff alleges is true, what happened may have been difficult, unpleasant, or even offensive, but it was not sufficiently "severe or pervasive" to constitute unlawful harassment. As discussed in Comment 3, whether or not any set of facts reaches the point of being "severe or pervasive" must be determined in light of the totality of the circumstances as viewed from the perspective of a reasonable person in the plaintiff's position. On summary judgment, this requires judges to put themselves in the shoes of the plaintiff, step into the circumstances the plaintiff faced, and try to decide how a reasonable plaintiff would have perceived things.

To complicate the task, at the summary judgment stage of a case, all the judge has to work with to assess the totality of the circumstances are "affidavits, declarations,

SB 1300 (Jackson)
Page 13 of 28

admissions, answers to interrogatories, depositions, and matters of which judicial notice shall or may be taken." (Code Civ. Proc. Sec. 437c(b)(1)) – in other words, a lot of papers, with an occasional video deposition thrown in. The judge has to evaluate all the nuance and context that comprise "the totality of the circumstances" based on a limited universe of material and without the benefit of meeting or asking any questions of any of the people involved.

This would be a difficult task for any individual, but the economic and demographic gulf between most victims of harassment and most judges makes it even more challenging. All judges have a form of tenure – they cannot be fired from their jobs and denied the associated benefits arbitrarily. (Cal. Const., Art. VI, Secs. 8, 18, 18.1 and 18.5.) By contrast, many if not most Californians work as "at-will" employees, meaning they can be fired at any time for any lawful reason, including for no reason at all. (Lab. Code Sec. 2922.)  The vast majority of victims of sexual harassment are women. [1] By contrast, most California judges are men. The vast majority of victims of racial harassment are people of color. By contrast, the California bench is mostly white. The vast majority of victims of homophobic harassment identify as lesbian or gay. The overwhelming majority of California judges identify as straight. [2]

This bill would note the tremendous difficulty inherent in ruling on a summary judgment motion in the context of workplace harassment lawsuits. With that in mind, it would state the view of the Legislature that such cases are rarely appropriate for disposition on summary judgment. Two additional points are implied: first, that a fact-finder informed by live testimony and exposed to all of the nuances of a case will be better situated to assess the totality of the circumstances than a fact finder informed only by affidavits, declarations, deposition transcripts and discovery; and second, that a jury of peers, composed of a diverse cross-section of the community, will be better able to appraise how a reasonable person in the plaintiff's position would have perceived the totality of the circumstances than any single individual, no matter how legally adept.

5.  <u>Intervening early to stop unwelcome conduct before it becomes severe or pervasive</u>

Existing law requires employers "to take all reasonable steps necessary to prevent discrimination from occurring." (Gov. Code Sec. 12940(k).) The courts have ruled, however, that in order to prevail on a claim under this section, the plaintiff must show, first, that unlawful discrimination or harassment took place. (*Dickson v. Burke Williams, Inc.* (2015) 234 Cal.App.4th 1307, 1314; (*Trujillo v. North County Transit Dist.* (1998) 63 Cal.App.4th 280, 289.) This somewhat circular logic – that the duty to prevent

---

[1] *Select Task Force on the Study of Harassment in the Workplace* (June 2016) U.S. Equal Employment Opportunity Commission, p. 5-14 <https://www.eeoc.gov/eeoc/task_force/harassment/upload/report.pdf> (as of Apr. 5, 2018).

[2] *Demographic Data Provided by Justices and Judges, Relative to Gender, Race/Ethnicity, and Gender Identity/Sexual Orientation (Gov. Code, § 12011.5(n)) As of December 31, 2017*, Judicial Council of California <http://www.courts.ca.gov/documents/2018-JO-Demographic-Data.pdf> (as of Apr. 5, 2018).

harassment or discrimination only arises once it has occurred – renders subdivision (k) largely an "add-on" cause of action; something that plaintiffs can only win if they have already prevailed on the harassment or discrimination claim. It also means that there is no consequence for employers who are aware of unwelcome, potentially harassing conduct in the workplace, but who nonetheless sit on their hands and do little or nothing about it. In other words, under current law, the legal duty to prevent harassment arises too late to be of any actual help to victims.

Imagine if, for instance, Eddie Employee shows pornographic images to Wendy Worker and Wendy Worker reports this behavior to Sammy Supervisor. Wendy tells Sammy that the behavior was unwelcome to her. Under existing law, there is no legal consequence if Sammy does nothing in response, unless Eddie continues to bombard Wendy with these images to the point that it becomes severe or pervasive. Most employers would want Sammy Supervisor to take responsive action immediately upon first hearing Wendy's report because of the concern that if the behavior escalates, the employer could then become liable. Many employer policy manuals and supervisor trainings will reflect this preferred response. Yet under existing law, Sammy Supervisor has no legal duty to take any action in response to Wendy's initial complaint. That leaves Wendy Worker with only one legal option in the face of an employer who is not taking action in response to her complaints about unwelcome conduct: endure the behavior until it becomes severe or pervasive.

This bill would, instead, make it so that plaintiffs need not prove that the unwelcome conduct reached the point of being severe or pervasive – thus constituting harassment in legal terms – in order to prevail on a claim that the employer did not take reasonable steps to prevent harassment or discrimination from taking place. In essence, this would impose a legal duty on employers to take action in response to reports of unwelcome conduct in the workplace. In other words, it moves up the moment that employers must take action to a time when that action could still be effective to prevent unwelcome conduct from escalating into harassment.

To ensure that employers do not have to take dramatic action in response to minor issues, the bill would require only that the responsive steps be reasonable. Thus, in the example above for instance, a brief conversation with Eddie asking him not to show pornographic images to other employees, or an email to all employees reminding them of the office policy against viewing pornographic images at work would probably be sufficient.

Similarly, to ensure that employers would not be liable for failing to take action against complaints of commonplace "unwelcome conduct," such as chewing gum with your mouth open, or talking loudly at the water cooler, the bill would only require employers to respond to reports of conduct which, if it escalated in severity or pervasiveness, would constitute unlawful harassment.

SB 1300 (Jackson)
Page 15 of 28

In opposition to this aspect of SB 1300 -- the imposition of a legal duty on employers to take reasonable action to prevent unwelcome, discriminatory conduct from escalating – the California Chamber of Commerce and organizations affiliated with it advance two primary concerns.

First, they assert that this component of SB 1300 lacks a standing requirement. In other words, they say, absolutely anyone could sue the employer for failure to take action to prevent unwelcome, discriminatory behavior from escalating into full blown harassment in the legal sense. As introduced, the bill was certainly susceptible to such an interpretation, but subsequent amendments clarify that an employer's duty to take reasonable action would be triggered only by knowledge of discriminatory conduct that is unwelcome "to the plaintiff." This language appears to tie the cause of action firmly to a party who was actually aggrieved by the employer's failure to act, though it may be possible to make the standing requirement even clearer.

Second, the group led by the Chamber of Commerce states that this component of SB 1300 creates a "private right of action for failure to prevent sexual harassment and discrimination." In as much as SB 1300 would give employers the legal duty to take reasonable action to stop unwelcome, discriminatory behavior from escalating into full blown harassment in the legal sense, SB 1300 does create a cause of action if the employer does not take reasonable action in such a situation. For instance, an employer could be subject to liability for doing nothing in response to a report from an employee that her co-worker keeps touching her inappropriately and she would like it to stop. So long as the employer takes reasonable steps to prevent the co-worker from doing it again, however, no liability would arise.

The Chamber-led group points out that under FEHA regulations, "whether an employer did or did not properly prevent harassment or discrimination requires an 'individualized assessment, depending upon numerous factors sometimes unique to the particular employer including, but not limited to, its workforce size, budget, and nature of its business, as well as upon the facts of a particular case.'" With that in mind, figuring out what would be "reasonable" for an employer to do when confronted by a situation that could morph into harassment is "extremely fact specific and not clearly defined." With that in mind, the Chamber-led group believes "this determination should not be left to a member of the public" and "should remain with DFEH."

While SB 1300 does not remove anything from DFEH's jurisdiction, it is true that determining what is "reasonable" in any given scenario can be challenging. Yet it is also fair to say that our legal system frequently entrusts the public with deciding what is "reasonable." Indeed, that trust is one of the cornerstones of our legal system. We ask the public, in the form of a jury of our peers, to determine our fate and, where matters require specialized knowledge, that is the function of an expert witness.

Still, the Chamber-led group urges that the imposition of liability should never be taken lightly, given what it asserts are high associated costs. Then again, it can be argued that

there is a large cost to employees, employers, and society at large to the ongoing prevalence of harassment in the workplace.[3] For example, a study of just the U.S. Army estimated its annual costs associated with sexual harassment were $250,000,000.[4] It may be that further incentivizing early intervention would result in less harassment and, correspondingly, a drop in liability.

6.  Prohibiting all forms of harassment by third party entities

Workers are generally protected against unlawful harassment in the workplace. (Gov. Code Sec. 12940(j).) Not just any unwelcome, severe or pervasive behavior is unlawful, however. As detailed in Comment 3, above, unlawful harassment is unwelcome, severe or pervasive conduct perpetrated *on account of* race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, genetic information, marital status, sex, gender, gender identity, gender expression, age, sexual orientation, or military and veteran status. Thus, severe or pervasive ridicule of an employee because they are a New York Yankee fan (while entirely justified) may be harassment in the colloquial sense, but it is not unlawful harassment in the legal sense. Harassment of an employee because they are HIV positive, by contrast, is unlawful harassment, because the harassment has a nexus to a medical condition.

In 2003, the Legislature enacted AB 76 (Corbett, Ch. 671, Stats. 2003), which made it clear that employers may also be responsible for unlawful harassment of its employees, applicants, or independent contractors by non-employee third parties.

The bill was a response to the 2002 case *Salazar v. Diversified Paratransit, Inc.*, 103 Cal.App.4th 131. In that case, a passenger repeatedly got out of his seat, exposed himself to the driver, leered at her, and grabbed at her. Although the passenger's behavior was known to the employer through past incidents and the driver's complaints, the employer kept the driver on the same route. Eventually, the passenger sexually assaulted the driver. Ruling on the question of whether the employer could be held liable for sexual harassment, the *Salazar* court said no, because at the time, the Fair Employment and Housing Act did not provide for liability for harassment perpetuated by non-employee third parties. AB 76 addressed that omission.

Somewhat inexplicably, however, AB 76 was limited, as the result of a last minute amendment to the bill, to *sexual* harassment only. (Sen. Amend. to Assem. Bill No. 76 (2003-2004 Reg. Sess.) Aug. 28, 2003.) As a result, an employer can be held liable under current law if it knows about *sexual* harassment by a non-employee and does nothing about it, but not if the harassment is based on any of the other categories – race,

---

[3] *See* Merchant, *The Insidious Economic Impact of Sexual Harassment* (Nov. 29, 2017) Harvard Business Review <https://hbr.org/2017/11/the-insidious-economic-impact-of-sexual-harassment> (as of Mar. 30, 2018).
[4] Faley, R.H., Knapp, D.E., Kustis, G.A. et al., *Estimating the Organizational Costs of Sexual Harassment: The Case of the U.S. Army* (1999) Journal of Business and Psychology 13: 461. <https://doi.org/10.1023/A:1022987119277> (as of Apr. 16, 2018)

religious creed, sexual orientation, medical condition, disability, or military status, among others -- that define unlawful harassment by others. Thus, for instance, under current law, an employer could be held liable if it knows and does nothing about a delivery person who makes crude *sexual* remarks to the receptionist while walking through the lobby every day, but the employer could not be held liable if, instead, the delivery person made *racist* remarks.

SB 1300 would fix this incongruity in the law.

7.   Expanding and strengthening sexual harassment prevention training

In the context of large employers, California has had sexual harassment prevention training requirements on the books for over a decade. In 2004, California enacted AB 1825 (AB 1825, Reyes, Ch. 933, Stats. 2004) mandating that all employers with 50 or more employees conduct two hours of sexual harassment prevention training for all supervisory employees. (Gov. Code Sec. 12950.1.)

More recently, the State has adopted legislation that imposes more stringent sexual harassment prevention training requirements for certain industries in which sexual harassment and violence has been especially well-documented and problematic. In 2014, Senator Monning's bill, SB 1087 (Ch. 750, Stats. 2014), made it mandatory for farm labor contractors to provide at least two hours of sexual harassment prevention training annually to their supervisory employees and at least an hour of sexual harassment prevention training to all other employees. (*See* Lab. Code Sec. 1684(a)(8).) After a study documented spotty compliance, Senator Monning followed up last year with SB 295 (Ch. 424, Stats. 2017) in order to beef up enforcement. (*See* Lab. Code Sec. 1697.5.) In the janitorial sector, Assemblymember Gonzalez-Fletcher's 2016 bill, AB 1978 (Ch. 373, Stats. 2016), mandated development of biennial, in-person sexual harassment prevention training for all employees. (*See* Lab. Code Secs. 1420-1434.) That program is just coming online now.

In addition to these specific mandates, California's Fair Employment and Housing Act exposes employers to potential liability if they fail to take all reasonable steps to avoid harassment, discrimination, and retaliation, in their workplaces. (Gov. Code 12940(k).) As a result, many employers undertake some form of sexual harassment prevention training for their employees even where it is not explicitly required by law.

The use of these kinds of sexual harassment prevention trainings may have helped address the problem to some degree. Nonetheless, the revelations of 2017 demonstrate that significant amounts of sexual harassment and violence have persisted in spite of these prevention training programs. That has led to a re-examination of the scope, format, and content of these trainings with an eye toward making them more effective.

One particular alternative training approach gaining increasing popularity in recent years is bystander intervention training. Such training focuses on how community

SB 1300 (Jackson)
Page 18 of 28

members can identify and effectively disrupt instances of sexual harassment, violence, and potential violence. The idea is, in essence, to train people to overcome the common inclination to mind their own business when they observe situations that they find concerning. Instead, trainees are encouraged to proactively check in on others. Rather than verbally or physically confronting the perpetrator, however, bystander intervention trainees are generally taught techniques for de-escalation, distraction, and diversion. At the same time, trainees who can do so safely are urged to utilize that position to draw the perpetrator's attention to the inappropriate nature of the conduct at an appropriate time.

Bystander intervention training is appealing not merely as a mechanism for disrupting and preventing individual incidents. Proponents of such training also point out that, by creating a shared sense of responsibility to stop sexual harassment and sexual violence from taking place, the trainings also encourage a cultural shift toward greater overall respect.

There is some evidence that bystander intervention training does, in fact, have this effect. Research on the impacts of bystander intervention training has revealed shifts in attitudes and increased likelihood that trainees will act to intervene in situations they perceive to involve sexual harassment or the risk of sexual violence. [5]   Not surprisingly given these upsides, the use of bystander intervention training has enjoyed rapid growth. Since its origins in the mid-1990s, bystander intervention training has become a standard feature in many of the orientation sessions that California colleges and universities provide for incoming students. [6]

This bill would mandate the inclusion of a bystander intervention component in employers' biannual sexual harassment prevention training.

Writing in opposition the bill generally, and this bystander intervention training piece particularly, the California Manufacturers & Technology Association (CMTA) writes:

> Training employees on how to recognize and report sexual harassment in the workplace is an appropriate responsibility of the employer; training employees to intervene when witnessing harassment or discrimination is not. By mandating this type of education and training in the employment context, SB 1300 essentially imposes a new legal duty and obligation to act on individuals where none currently exists in law. Employees receiving this instruction from their employers will naturally feel a sense of responsibility given the employment relationship. In

---

[5] Coker, Cook-Craig, Williams, Fisher, Clear, Garcia and Hegge. *Evaluation of Green Dot: An Active Bystander Intervention to Reduce Sexual Violence on College Campuses*. (June 2, 2011) Violence Against Women <http://vaw.sagepub.com/content/17/6/777> (as of February 8, 2018), pp. 780-781.
[6] Kingkade. *This Is Why Every College Is Talking About Bystander Intervention*. (Feb. 8, 2016) Huffington Post <https://www.huffingtonpost.com/entry/colleges-bystander-intervention_us_56abc134e4b0010 e80ea021d> (as of Feb. 8, 2017).

> addition, the specificity of the mandate imposes an expectation among employees that their co-workers will respond when witnessing situation in the workplace.
>
> This new burden increases liability for manufacturers who are responsible for the health and safety of all their employees.

Given the questions raised, CMTA argues: "The intervention of employees into potentially hostile situations deserves a bigger discussion than a footnote in this bill."

In addition to bystander intervention training, SB 1300 would enact two other modifications to FEHA's existing sexual harassment prevention training requirements. First, the bill would require sexual harassment prevention training for all workers, not just those in supervisory positions. Second, the bill would expand the number of employers covered by the requirement to provide sexual harassment prevention training. Currently, only those employers with 50 or more employees have to provide the training; this bill would expand the requirement to all employers with five or more employees. Taken together, these two changes would dramatically increase the number of workers who receive training on the prevention of sexual harassment.

The expansion of these training requirements will no doubt impose additional costs on employers, both in terms of providing the trainings themselves and in terms of time taken away from work to participate in the training. On the other hand, sexual harassment itself has been shown to diminish productivity, not just for the victim, but for the employer and the economy as a whole as well.[7]  Moreover, employers stand to benefit economically if the trainings succeed at reducing workplace harassment and, by extension, the employer's exposure to liability. It is for that reason that many employers already provide sexual harassment prevention training that goes well beyond the minimum required by the existing law. In that sense, one way to view the components of this bill directed at preventative training is to see them as enshrining in law what is already the best practice among employers.

8.  Eliminating the legal tactic of muzzling workers preemptively

Our nation's present reckoning with the persistent prevalence of sexual harassment has shed light on the role of certain legal tactics, in the form of contractual provisions, which have enabled harassers to shield themselves from accountability. The use of non-disparagement agreements is one.

---

[7] *See* Merchant, *The Insidious Economic Impact of Sexual Harassment* (Nov. 29, 2017) Harvard Business Review <https://hbr.org/2017/11/the-insidious-economic-impact-of-sexual-harassment> (as of Mar. 30, 2018); and Faley, R.H., Knapp, D.E., Kustis, G.A. et al., *Estimating the Organizational Costs of Sexual Harassment: The Case of the U.S. Army* (1999) Journal of Business and Psychology 13: 461. https://doi.org/10.1023/A:1022987119277

SB 1300 (Jackson)
Page 20 of 28

As the name implies, non-disparagement agreements are contractually-based promises not to criticize someone, or some entity, publicly. They often come coupled with liquidated damages – meaning a pre-determined penalty for a violation -- some reportedly as high as a million dollars for a single violation. Such draconian liquidated damages provisions probably would not stand up in court (*see* Civ. Code Sec. 1671) and there are already certain limitations on what a non-disparagement agreement can lawfully cover. Most notably, the National Labor Relations Act does not permit employers to prevent workers from discussing sexual harassment or discrimination complaints at work or in a legal claim. (29 U.S.C. Sec. 158(a)(1).) Nonetheless, as a practical matter, even a legally infirm non-disparagement clause can still have a powerful deterrent effect on victims or witnesses who might otherwise come forward publicly.

In effect, non-disparagement agreements bind people to silence. In the context of workplace harassment, non-disparagement agreements have the effect of preventing word from spreading about harassing behavior. This is part of what allows serial harassers to go undetected, sometimes for years. If what has been widely reported is accurate, the now notorious case of Harvey Weinstein offers what may be the quintessential example.[8]

Used in the context of settlement agreements to resolve a known, existing dispute between two parties, mutual non-disparagement agreements (key elements of what are often referred to as "secret settlements") are arguably defensible: both sides want to put the matter behind them and do not want any further reputational damage to come of it. In theory at least, the victim agrees to this voluntarily. In the context of workplace harassment claims, the defendant may be seeking to sweep the matter under the rug, so to speak, but the victim may also have a legitimate desire for privacy regarding what took place. Senate Bill 820 (Leyva, 2018) directs its attention to solving the conundrum presented by the use of non-disparagement clauses in the context of settlements or severance agreements. This bill would not impact such agreements.

This bill addresses the *preemptive* use of non-disparagement agreements, in exchange for a raise or a bonus, or as a condition of hire or continued employment. In these contexts, arguably, there is no evident public policy interest in enforcing silence. Employees who sign such agreements do not even know what they are agreeing to stay silent about yet. The benefits of muzzling employees in advance enure only to the employer, who is then free to proceed with substantially reduced risk that evidence of improper behavior – such as harassment – will come to light.

---

[8] Fabio, *The Harvey Weinstein Effect: The End Of Nondisclosure Agreements In Sexual Assault Cases?* (Oct. 26, 2017) Forbes <https://www.forbes.com/sites/michellefabio/2017/10/26/the-harvey-weinstein-effect-the-end-of-nondisclosure-agreements-in-sexual-assault-cases/#3dc80fea2c11> (as of Feb. 10, 2018).

SB 1300 (Jackson)
Page 21 of 28

Here is an example of a non-disparagement clause in an employment contract, described in the Harvard Business Review as "boilerplate" language utilized by "a major corporation":

> You shall not, at any time, directly or indirectly, disparage Company, including making or publishing any statement, written, oral, electronic, or digital, truthful or otherwise, which may adversely affect the business, public image, reputation or goodwill of the company, including its operations, employees, directors and its past, present or future products or services. [9]

This bill would prohibit the preemptive use of such sweeping non-disparagement clauses. It would make it unlawful for an employer to require an applicant or employee, as a condition of hire or continued employment, to sign any document that purports to deny the employee the right to disclose information about unlawful or potentially unlawful workplace conduct, including sexual harassment. By making employers liable merely for including such a provision in an employment contract, unscrupulous employers would be prevented from relying on preemptive non-disparagement provisions to intimidate workers into silence, even when the employer knows the provision would not ultimately stand up in court.

In opposing these provisions of the bill, the Chamber writes that:

> Settlement agreements are used often with regards to sexual harassment suits because the victim does not want the facts of the case being made public, so the employee will negotiate with the employer regarding settlement prior to filing a lawsuit. If the employer cannot guarantee that the employee will not disparage the employer after a settlement agreement has been made, the employer will not have the same motivation to settle a case. As the benefit of a settlement agreement for the employer is reduced, the less likely the employer is to settle claims out of court. Therefore, SB 1300 will chill the use of settlement agreements and will drive employers to fight these cases in court instead of utilizing early resolution.

As already stated, however, SB 1300 only applies to the time of hire or continued employment. It would not apply to a settlement scenario, therefore, unless continued employment was a term of the settlement, a rare occurrence.

---

[9] Lobel, *NDAs Are Out of Control. Here's What Needs to Change.* (Jan. 30, 2018) Harvard Business Review <https://hbr.org/2018/01/ndas-are-out-of-control-heres-what-needs-to-change> (as of Feb. 8, 2018).

SB 1300 (Jackson)
Page 22 of 28

9. <u>Eliminating the legal tactic of requiring preemptive release of claims and rights</u>

In legalese, to "release" or "waive" a claim or right means to give it up. When people "waive" or "release" a legal claim they might have against someone else, it means that the person agrees not to pursue that claim any further. Similarly, when people "waive" or "release" a right, they agree that they will not exercise that right.

As in the case of non-disparagement agreements, the use of waivers and releases as part of the effort to settle an existing dispute raises few public policy concerns. Indeed, finding the terms on which a plaintiff agrees to release claims is usually the whole point of a settlement. This bill would not impact the use of waivers and releases in the context of settlements or severance agreements.

This bill addresses the *preemptive* use of waivers, in exchange for a raise or a bonus, or as a condition of hire or continued employment. In these contexts, waivers of claims might be said to serve the public policy purpose of eliminating the possibility of future legal disputes. Similarly, it can be argued that waivers of rights limit potential dispute resolution to alternative forums, such as private arbitration, that are swifter and less costly to the parties and the public than the courts. But the public policy harms arguably outweigh these benefits by a significant margin. When employers require employees to waive claims preemptively, it provides a mechanism for regularly wiping out claims that might otherwise lead to accountability and reform. In the same vein, when employers can require employees to waive rights preemptively, it allows employers to whisk all allegations behind the curtain of confidential arbitration, thus preventing abuses from coming to light publicly. In these ways, allowing preemptive waivers of claims and rights shields abusive practices.

Sexual harassment is a prime example. One southern California company required all of its employees agree, upon hire, to mandatory, confidential arbitration of any workplace disputes.[10] It also made it a regular practice to have its employees sign documents waiving any claims they might otherwise have had against the company in exchange for small wage increases.[11] Sexual harassment allegations eventually surfaced against the Chief Executive Officer of the company anyway, but only after years during which he is reported to have sexually harassed and assaulted numerous employees.

California law already places certain restrictions on the use of releases. Courts have found that some claims may not be released as a matter of public policy. (Civ. Code Sec. 1668; *Tunkl v. Regents of the University of California* (1963) 60 Cal.2d 92 (1963).) Moreover, releases and waivers of claims are subject to the general principals of contract law. If a court finds that worker waived rights or claims under the influence of fraud or duress,

---

[10] Weber, *American Apparel Ordered to Pay Over $3 Million in Arbitration* (June 9, 2015) Wall Street Journal <https://www.wsj.com/articles/american-apparel-ordered-to-pay-over-3-million-in-arbitration-1433891690> (as of Apr. 1, 2018).
[11] Chow, *Dov Charney 5: Suits* (Dec. 8, 2016) Startup Podcast
<https://www.gimletmedia.com/startup/part-5-suits-season-4-episode-8> (as of Apr. 1, 2018).

SB 1300 (Jackson)
Page 23 of 28

for instance, it would invalidate the waiver and the worker could proceed on the underlying claim in spite of having signed a waiver. (Civ. Code Secs. 1567 and 1569.) Similarly, if a court determines the terms of a contract are unconscionable, it may void the unconscionable term even the entire contract. (Civ. Code Sec. 1670.5.)

This bill would make it an unlawful employment practice for an employer to require an employee, in exchange for a raise or bonus, or as a condition of employment or continued employment, to sign a release of a claim or a right under the Fair Employment and Housing Act. That would include claims for sexual harassment and the right to file a complaint with a state agency or pursue a civil action for sexual harassment.

Here again, the group led by the California Chamber of Commerce argues that SB 1300 will make settlements and severance payments more difficult:

> SB 1300 prohibits the use of a general release in exchange for a raise or bonus, or as a condition of employment or continued employment. However, the terms "raise" or "bonus" are not defined. For example, when terminating an employment relationship, severance agreements are often used. Even where there is no indication of an underlying claim, an employee is provided additional compensation in exchange for a general release. This is beneficial to most employees, especially to someone who needs additional time to find new employment. It is unclear under SB 1300 as to whether a severance payment would be considered a "bonus" and therefore prohibited.

The Chamber-led group also expresses concern that SB 1300's restriction on the use of general releases during ongoing employment will discourage employers from double-checking that they have been complying with employment laws, a practice referred to as "self-audits":

> the bill provides a disincentive to employer to take remedial action, such as wage and hour self-audits. Self-audits are extremely burdensome, time consuming and expensive. This is not a task employers take lightly and, if an employer is not permitted to utilize a general release of claims in exchange for a "bonus" or "raise" it may disincentivize employers to conduct self-audits.

SB 1300 only restricts the use of release of claims "under this part," meaning FEHA. Wage and hour laws do not fall within FEHA and so it is not clear that anything in SB 1300 would disincentivize wage and hour self-audits.

10. Ensuring that the fear of paying attorneys' fees and costs does not chill victims

Under existing law, FEHA provides for an award of attorneys' fees to a prevailing plaintiff, but not to a defendant except under narrow circumstances. (Gov. Code Sec. 12965(b); *Rosenman v. Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro* (2001) 91 Cal.App.4th 859, 864-865 (holding it improper to award attorney fees to prevailing defendants unless the FEHA case was "frivolous, unreasonable, or totally without foundation").)

This one-way fee shifting structure reflects the public policy that society should incentivize enforcement of our civil rights laws. The prospect of obtaining attorneys' fees makes attorneys willing to bring these cases if they think they can win, even when the client cannot pay. At the same time, if prevailing defendants could obtain attorneys' fees as well, it might cause plaintiffs to be afraid to bring these cases for fear of the financial punishment if they lose. For that reason, we do not punish civil rights plaintiffs who lose with having to pay the defendant's attorneys' fees, unless their case was frivolous.

Under a different existing law, if, during civil litigation, a defendant makes a settlement offer to the plaintiff, the plaintiff rejects the offer, and the final verdict for the plaintiff is less than what the defendant's settlement offer was, then the court may award all attorneys' fees and costs that the defendant incurred from the time the settlement offer was rejected. (Code. Civ. Proc. Sec. 998.) The public policy behind this statute is to promote the settlement of legal disputes.

A conundrum arises in cases where both FEHA's fee-shifting rule and Code of Civil Procedure Section 998's fee shifting rule apply. In other words, if a defendant makes a settlement offer in a FEHA civil rights case, the plaintiff rejects that offer, and the plaintiff loses (or wins but does not get as much as the plaintiff would have gotten by accepting the settlement offer), can the court make the plaintiff pay all of the defendant's post-offer attorneys' fees and costs? The California courts have split on this question. (Compare *Sviridov v. City of San Diego* (2017) 14 Cal. App. 5th 514, to *Arave v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, (4th Dist., Div. 2 Jan. 2, 2018) Case No. E061677.)

This bill would specify that the post-offer fee shifting effects of Code of Civil Procedure Section 998 do not apply to cases brought to enforce rights under FEHA. That choice reflects the belief that the public policy not to deter the enforcement of bona fide civil rights claims outweighs the public policy of encouraging settlements. The argument is that, while Code of Civil Procedure Section 998 may be entirely appropriate and useful in business litigation (to settle a contract dispute, say), when it is applied to lawsuits to enforce civil rights, it can be used as a way to intimidate plaintiffs from pursuing valid claims. If Code of Civil Procedure Section 998 applied to civil rights claims, then a defendant could make a lowball offer to the plaintiff almost immediately, forcing the plaintiff to choose between accepting the offer – effectively giving up on the claim – or

SB 1300 (Jackson)
Page 25 of 28

continuing on, but now with the risk of having to pay a significant price, in the form of attorney's fees and costs. It is rational to assume that, confronted by such a risk, many plaintiffs would simply walk away from the effort to vindicate their civil rights.

This bill would ensure that defendants cannot put Code of Civil Procedure Section 998 to that use. By the same token, so that plaintiffs cannot use FEHA's one way fee-shifting rule to bring or drag out meritless claims without any consequence, the bill would also incorporate case law that allows judges to award attorneys' fees and costs to the defendant, even in a civil rights case under FEHA, if the lawsuit was frivolous, unreasonable, or totally without foundation when brought, or if the plaintiff continued to litigate the case after the lawsuit had clearly become that way.

11. Proposed Amendments

As the bill's prohibition on requiring employees to sign non-disparagement agreements or releases of claims applies at the point of hire as well as during continued employment, the author may wish to insert a reference to applicants, as well as employees, into that component of the bill. Since this is a minor, technical amendment, however, it can wait until such time as other amends may be taken.

Support:  American Association of University Women of California; American Civil Liberties Union of California; American Federation of State, County and Municipal Employees; CA Conference Board of the Amalgamated Transit Union; CA Conference of Machinists; California Teamsters Public Affairs Council; Consumer Attorneys of California; Engineers and Scientists of CA, IFPTE Local 20, AFL-CIO; Legal Aid at Work; International Longshore & Warehouse Union; National Council of Jewish Women; Professional and Technical Engineers, IFPTE Local 21, AFL-CIO; Public Counsel; SAG-AFTRA; Service Employees International Union; UNITE-HERE, AFL-CIO; Utility Workers of America

Opposition:  Agricultural Council of California; Associated Builders and Contractors, Inc. – Northern California Chapter; Associated General Contractors; Brea Chamber of Commerce; California Ambulance Association; California Apartment Association; California Association for Health Services at Home; California Association of Joint Powers Authorities; California Chamber of Commerce; California Employment Law Council; California Farm Bureau Federation; California Hotel and Lodging Association; California Landscape Contractors Association; California League of Food Processors; California Manufacturers and Technology Association; California Restaurant Association; California Retailers Association; California Special Districts Association; California State Association of Counties; Cerritos Regional Chambers of Commerce; Citizens Against Lawsuit Abuse; Civil Justice Association of California; Culver City Chamber of Commerce; Family Business Association of California; Fresno Chamber of Commerce; Gateway Chamber Alliance; Greater Bakersfield Chamber of Commerce; Greater Coachella Valley Chamber of Commerce; Greater Conejo Valley Chamber of Commerce; Murrieta Chamber of Commerce; National Association of Mutual Insurance

SB 1300 (Jackson)
Page 26 of 28

Companies; National Federation of Independent Business; Official Police Garages of Los Angeles; Orange County Business Council; Palm Desert Area Chamber of Commerce; Personal Insurance Federation of California; Rancho Cordova Chamber of Commerce; Redondo Beach Chamber of Commerce; San Gabriel Valley Economic Partnership; Santa Ana Chamber of Commerce; Santa Maria Valley Chamber of Commerce; South Bay Association of Chambers of Commerce; Western Growers Association; Wildomar Chamber of Commerce; Wine Institute

## HISTORY

<u>Source</u>:  California Employment Lawyers Association; Equal Rights Advocates

<u>Related Pending Legislation</u>:

SB 820 (Leyva, 2018) would prohibit the use of non-disclosure agreements, sometimes known as "secret settlements," to resolve allegations of sexual harassment, except at the discretion of the victim. SB 820 is currently pending consideration before the Senate Committee on Judiciary.

SB 1038 (Leyva, 2018) would impose individual, personal liability on an employee who retaliates against anyone else for filing a complaint, testifying, assisting in a proceeding or, otherwise opposing harassment and discrimination, among other unlawful employment practices. SB 1038 is currently pending consideration before the Senate Committee on Judiciary.

SB 1223 (Galgiani, 2018) would direct the California Department of Industrial Relations to develop a harassment and discrimination prevention policy and training standard for use by employers in the construction industry. SB 1223 is currently pending consideration before the Senate Labor and Industrial Relations Committee.

 SB 1343 (Mitchell, 2018) would, like this bill, expand the reach of workplace sexual harassment prevention training requirements to include all employees (not just supervisory employees) and all workplaces with more than five employees (not just those with more than 50 employees). In addition and unlike this bill, SB 1343 would direct the Department of Fair Employment and Housing to develop a two hour video training course on workplace sexual harassment prevention, to be hosted on its Web site and made available to all California employers. Finally, and unlike this bill, SB 1343 would require DFEH to make its workplace sexual harassment materials available in at least three "alternate" languages. SB 1343 is currently pending consideration before the Senate Committee on the Judiciary.

AB 1870 (Reyes, 2018) would extend the statute of limitations for filing a claim of harassment, discrimination, or retaliation, among other unfair employment and housing practices, with the California Department of Fair Employment and Housing.

SB 1300 (Jackson)
Page 27 of 28

AB 1870 is currently pending consideration before the Assembly Committee on Labor and Employment.

SB 224 (Jackson, 2017) would add "elected officials," "directors and producers," and "lobbyists" to the list of examples of relationships covered by Civil Code Section 51.9's prohibition on sexual harassment in professional, business, and service contexts. SB 224 is awaiting policy committee assignment in the Assembly.

SB 419 (Portantino, 2017) would, with regard to sexual and related forms of harassment, explicitly apply the anti-retaliation protections of the California Fair Employment and Housing Act (FEHA) to legislative employees and lobbyists. It thus underscores that FEHA prohibits the Legislature from taking adverse action against a lobbyist or legislative employee who: files a sexual harassment complaint with the Department of Fair Employment and Housing (DFEH); testifies or assists in any proceeding related to such a complaint; or otherwise acts to oppose any practice forbidden under FEHA. SB 419 is awaiting policy committee assignment in the Assembly.

Prior Legislation:

AB 403 (Melendez, Ch. 2, Stats. 2018) provided whistleblower protections for employees and Members of the Legislature.  It authorized the whistleblower to submit a complaint with either house of the Legislature pursuant to its rules alleging a violation of the house ethics rules or retaliatory conduct by the Member for attempting to file the complaint. AB 403 also provided a right of action for a legislative employee who has made a protected disclosure and suffered an adverse action for making that disclosure.

SB 396 (Lara, Ch. 858, Stats. 2017) required employers with five or more employees to put up a DFEH poster regarding transgender rights and mandated that employers with 50 or more employees include a component regarding harassment based on gender identity, gender expression, and sexual orientation in their sexual harassment prevention training.

AB 2053 (Gonzalez, Ch. 306, Stats. 2014) required the inclusion of a component in the two hour training on prevention of "abusive conduct," defined as "conduct of an employer or employee in the workplace, with malice, that a reasonable person would find hostile, offensive, and unrelated to an employer's legitimate business interests."

AB 1501 (Niello, 2007) would have deleted the two hour classroom requirement and the provision that the trainers or educators have knowledge and expertise in the prevention of harassment, discrimination, and retaliation. AB 1501 died in the Assembly Committee on Transportation.

AB 1825 (Reyes, Ch. 933, Stats. 2004) added Section 12950.1 to the Government Code, mandating that all employers with 50 or more employees conduct two hours of sexual harassment prevention training for all supervisory employees.

SB 1300 (Jackson)
Page 28 of 28

SB 76 (Corbett, Ch. 671, Stats. 2003) which made it clear that employers may be responsible for sexual harassment of its employees, applicants, or independent contractors by non-employees.

AB 2264 (Speier, Ch. 908, Stats. 1992) added Section 12950 to the Government Code, requiring: DFEH to amend its poster regarding workplace discrimination to include information on the illegality of sexual harassment; employers to put up this poster in a prominent and accessible location; and employers to distribute to each employee a DFEH information sheet on sexual harassment or equivalent content.

<u>Prior Vote</u>:  Senate Labor and Industrial Relations Committee (Ayes 4, Noes 1)

***************