CHRIS BAKER, State Bar No. 181557
cbaker@bakerlp.com
DEBORAH SCHWARTZ, State Bar No. 208934
dschwartz@bakerlp.com
BAKER CURTIS & SCHWARTZ, P.C.
1 California Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 433-1064
Fax:  (415) 366-2525

Attorneys for Plaintiff and PAGA Representatives
MARCIE HAMILTON and JIM ISAACSON

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| MARCIE HAMILTON,<br><br>             Plaintiff,<br><br>    vs.<br><br>JUUL LABS, INC.,<br><br>             Defendant. | Case No. 3:20-CV-3710-EMC<br><br>**PLAINTIFF'S MOTION FOR APPROVAL OF PAGA SETTLEMENT**<br><br>Date: November 4, 2021<br>Time: 1:30 p.m.<br>Dept: Courtroom 5, 17th Floor<br>Judge: Honorable Edward M. Chen |

TO THE LABOR WORKFORCE AND DEVELOPMENT AGENCY AND DEFENDANT

JUUL LABS, INC.:

On November 4, 2021 at 1:30 p.m., or on a date and time directed by the Court, Plaintiff

Marcie Hamilton and PAGA Representative Jim Isaacson will move for approval of a settlement

agreement under the Private Attorneys General Act ("PAGA") in accordance with California

Labor Code § 2699(1)(2).  The hearing will take place at this address:

Before the Honorable Edward M. Chen
United States District Court for the Northern District of California
Floor 17, Courtroom 5
450 Golden Gate Ave
San Francisco, CA 94102

1    The moving parties request that the Court grant the motion for settlement approval

2 because the settlement furthers PAGA's purposes and policies, is not collusive, is fair to those

3 affected, and is otherwise consistent with PAGA.  Juul Labs also supports approval of the

4 settlement. However, Juul Labs does not join the memorandum of points and authorities or the

5 other pleadings filed in support of the motion.  Juul Labs contends the PAGA settlement speaks

6 for itself and should be approved on that basis alone.

7    This motion is based on this notice, the memorandum of points and authorities, the

8 supporting declarations, the other filings in this Action, and any other oral or documentary

9 evidence as may be presented to the Court at or before the hearing on the motion.

10
Dated:   September 30, 2021                    BAKER CURTIS & SCHWARTZ, P.C.
11

12                                             By:_____/s/ Chris Baker_____
                                                  Chris Baker
13                                                Attorneys for Plaintiff and PAGA
                                                  Representatives
14                                                MARCIE HAMILTON and JIM ISAACSON

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S MOTION FOR APPROVAL OF PAGA SETTLEMENT / CASE NO. 3:20-CV-3710-EMC

# TABLE OF CONTENTS

Page No.

I.     INTRODUCTION .................................................................................................. 1

II.    ISSUE PRESENTED ............................................................................................. 1

III.   FACTS AND BACKGROUND ............................................................................ 2

    A.  Legal Basis for Claims ................................................................................... 2

    B.  Juul Labs' Gag Rules ..................................................................................... 4

        1.   The NDAs ............................................................................................. 4

        2.   The Policies .......................................................................................... 5

        3.   Ambiguity and the "Saving Provisions" .............................................. 6

        4.   The Practices ........................................................................................ 8

    C.  Litigation to Date............................................................................................ 9

    D.  Recent Changes to the Gag Rules .................................................................. 9

    E.  The Settlement ............................................................................................. 10

        1.   The PAGA Group Members ............................................................... 10

        2.   The Settlement Payment and Plan of Allocation ............................... 11

        3.   The Programmatic Relief ................................................................... 12

        4.   The Suspension, Forgiveness and Cure Provisions ........................... 14

        5.   The Settlement Release ...................................................................... 14

    F.  The Maximum Exposure and Case Value .................................................... 15

    G.  Comparable Settlements............................................................................... 17

IV.    ARGUMENT ...................................................................................................... 19

    A.  The Standard of Review............................................................................... 19

    B.  The Settlement Protects Workers by Remediating Present Violations
        and Deterring Future Ones........................................................................... 20

    C.  The Settlement Collects Adequate Civil Penalties....................................... 21

    D.  The Settlement Incentivizes Private Enforcement of the Labor Code,
        While Maintaining the LWDA's Enforcement Primacy............................... 21

    E.  The Settlement Has a Rational Basis in View of the Strength and
        Value of the PAGA Claims   ........................................................................ 22

    F.   The Settlement Is Neither Collusive nor Unfair to Those Affected............................ 23

V.    CONCLUSION ................................................................................................... 24

# TABLE OF AUTHORITIES

Page No.

## CASES

*Alderson v. U.S.*,
718 F.Supp.2d 1186 (C.D. Cal. 2010) ........................................................................ 3

*Amaral v. Contas Corp. No. 2*,
163 Cal.App.4th 1157 (2008) ........................................................................ 16, 17

*Arias v. Superior Court*,
46 Cal.4th 969 (2009) ........................................................................ 14

*Brown v. TGS Management Co., LLC*,
57 Cal.App.5th 303 (2020) ........................................................................ 2

*Doe v. Google Inc.*,
54 Cal.App.5th 948 (2020) ........................................................................ 2, 20

*Gonzalez v. CoreCivic of Tennessee, LLC*,
2018 WL 4388425 (E.D. Cal. Sept. 13, 2018) ........................................................................ 23

*Iskanian v. CLS Transportation Los Angeles, LLC*,
59 Cal.4th 348 (2014) ........................................................................ 20

*Kim v. Allison*,
8 F.4th 1170 (9th Cir. 2021) ........................................................................ 23

*Kim v. Reins Int'l California, Inc.*,
9 Cal.5th 73 (2020) ........................................................................ 20

*Magadia v. Wal-Mart Associates, Inc.*,
384 F.Supp.3d 1058 (N.D. Cal. 2019) ........................................................................ 17

*Mathews v. Eldridge*,
424 U.S. 319 (1976) ........................................................................ 14

*O'Conner v. Uber Technologies*,
2016 WL 3548370 (N.D. Cal. June 30, 2016) ........................................................................ 16

*O'Connor v. Uber Technologies, Inc.*,
201 F.Supp.3d 1110 (N.D. Cal. 2016) ........................................................................ 19, 20

*Pereyra v. Guaranteed Rate, Inc.*,
2019 WL 2716519 (N.D. Cal. June 28, 2019) ........................................................................ 6

*R.R. Donnelly & Sons Co. v. Fagan*,
767 F.Supp. 1259 (S.D.N.Y. 1991) ........................................................................ 3

*Reno v. ACLU,*
    521 U.S. 844 (1997) ....................................................................................................... 6

*Salazar v. PODS Enterprise, LLC,*
    2019 WL 2023726 (C.D. Cal. May 8, 2019) ................................................................ 16

*Smith v. Lux Retail North America,*
    2013 WL 2932243 (N.D. Cal. June 13, 2013) ............................................................. 16

*Snow v. United Parcel Services, Inc.,*
    2020 WL 1638250 (C.D. Cal April 1, 2020) ............................................................... 16

*Steenhuyse v. UBS Financial Services, Inc.,*
    317 F.Supp.3d 1062 (N.D. Cal. 2018) ......................................................................... 16

*Sunpower v. SolarCity Corp.,*
    2012 WL 6160472 (N.D. Cal. Dec. 11, 2012) ............................................................... 3

*Valley Bank of Nevada v. Superior Court,*
    15 Cal.3d 652 (1975) ................................................................................................... 13

*Viceral v. Mistras Group, Inc.,*
    2016 WL 5907869 (N.D. Cal. 2016)..................................................................... 19, 21

*White v. Davis,*
    13 Cal.3d 757 (1975) ..................................................................................................... 3

*Williams v Superior Court,*
    3 Cal.5th 531 (2017) ............................................................................................. 19, 20


**CODES AND STATUTES**

18 U.S.C. § 1833(b) ............................................................................................................ 13

California Business & Professions Code
    § 16600 .................................................................................................................... 2, 12

California Civil Code
    § 1542 .................................................................................................................... 15, 22

California Government Code
    § 12964.5 ......................................................................................................... 5, 12, 13
    § 12964.5(a) .................................................................................................................. 2

California Labor Code
    § 96(k) ..................................................................................................................... 2, 15
    § 98.6 ..................................................................................................................... 11, 15
    § 98.6(b)(3) .................................................................................................................. 11
    §§ 232 ............................................................................................................ 2, 12, 13, 15

§ 232.5 ................................................................................................... 2, 8, 12, 13, 15

§ 232.5(d) ............................................................................................................... 3

§ 432..5 ................................................................................................................. 15

§ 1101 ................................................................................................... 2, 12, 13, 15

§ 1102 ................................................................................................... 2, 12, 13, 15

§ 1102.5 ...................................................................................................... 12, 13, 15

§ 1102.5(a) .................................................................................................... 2, 11

§ 1102.5(f) .......................................................................................................... 11

§ 1197.5 ................................................................................................................ 12

§ 1197.5(k) ............................................................................................ 2, 12, 13, 15

§ 2699(a)(3) ......................................................................................................... 15

§ 2699(b) ............................................................................................................. 11

§ 2699(e)(2) ......................................................................................................... 16

§ 2699(f) .............................................................................................................. 11

§ 2699(i) .............................................................................................................. 11

§ 2699(l)(2) ..................................................................................................... 1, 19

**OTHER**

H. Blake, <u>Employee Agreements Not to Compete</u>, 73 Harv. Law. Review 625 (1960) ................. 3

Managing Class Action Litigation: A Pocket Guide For Judges at 13-14
   (3rd Ed. 2010) ...................................................................................................... 21

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.   INTRODUCTION

Plaintiff Marcie Hamilton and PAGA Representative Jim Isaacson ("Plaintiff," for simplicity) have agreed to resolve their PAGA claims against Defendant Juul Labs, Inc. for about $2.22M ($34.00 per employee pay period) and programmatic relief.  Of this amount, about $1.27M is attributable to former employee pay periods, and about $950,000 is attributable to current employee pay periods.

The programmatic relief is extensive.  It includes: (1) modifications to Juul Labs' agreements and policies which Plaintiff alleges restrict speech and the disclosure of information (the "Gag Rules"); (2) notice to employees of their right to engage in activities protected under the Labor Code, including whistleblowing, speech about wages, working conditions, and political issues, and competing under California law, notwithstanding any past or present Gag Rule to the contrary; and (3) a prohibition on Juul Labs acting contrary to these employee rights.

A PAGA case is fundamentally a law enforcement action.  Analogous to a suspended sentence during probation, Juul Labs' obligation to pay the amount attributable to current employee pay periods (about $950,000) will be suspended and then forgiven over a two-year period provided Juul complies with its settlement obligations.

It is more important that Juul Labs immediately and conclusively modify its agreements and policies so that employees are not subject to illegal obligations under Juul's NDAs and other Gag Rules, affirmatively notify employees of their whistleblower and speech rights, and not act contrary to those rights, than potentially pay a greater amount in penalties some time down the road.  In other words, and appropriately under PAGA, the settlement prioritizes Juul's immediate compliance with the law over the contingent receipt of potentially greater penalties.

Plaintiff respectfully requests that the Court approve the settlement.

## II.   ISSUE PRESENTED

Should the Court approve the settlement of PAGA claims under Labor Code § 2699(l)(2)?

III.     **FACTS AND BACKGROUND**

A.     **Legal Basis for Claims**

Numerous provisions of California law, taken together, "establish as a minimum employment standard an employee *anti*-gag rule." *Doe v. Google Inc.*, 54 Cal.App.5th 948, 961 (2020) (emphasis added).

For example, California law protects whistleblowers. Labor Code § 1102.5(a) makes it unlawful for an employer to adopt or enforce a policy or rule that prevents employees from disclosing information about reasonably suspected violations of the law to persons with the power to address the problem, e.g., government agencies or another employee who has the authority to investigate, discover, or correct the legal violation. *Doe*, *supra*, 54 Cal.App.5th at 958. Government Code § 12964.5(a) prohibits employers from requiring employees to sign certain non-disparagement agreements or other documents that purport to deny them the right to disclose information to *anyone*, including the press, about any "unlawful or potentially unlawful conduct."

California law also protects a broad array of employee speech and activity unrelated to whistleblowing. Labor Code § 96(k) prohibits employer retaliation for "'lawful conduct occurring during nonworking hours away from the employer's premises,' so employers do not seek to control the non-work aspects of their employees' lives." *Doe*, *supra*, 54 Cal.App.5th at 958 (citations omitted). Labor Code §§ 232, 232.5, and 1197.5(k) generally outlaw employer prohibitions on the disclosure or discussion of wages and working conditions. And "Labor Code §§ 1101 and 1102 are 'designed to protect the fundamental right of employees in general to engage in political activity without interference by their employers.'" (Dkt # 42, p. 21). This includes political activity concerning the vaping epidemic, nicotine and tobacco use, and Juul Labs itself. (Dkt # 42, p. 16 ("Discussions about minor's use of vaping products, and the role of vaping products as alternatives to tobacco-based products, undoubtedly qualify as a 'cause' for purposes of § 1101 and 1102, and these discussions are likely to generate 'heated political debate.'")).

Finally, California Business & Professions Code § 16600 outlaws contracts in restraint of trade, rendering overbroad or oppressive non-disclosure agreements illegal. *Brown v. TGS*

*Management Co., LLC*, 57 Cal.App.5th 303, 318-319 (2020).  "A confidentiality agreement is also a restriction on trade, competition, and the free flow of information in the same manner as a non-compete agreement."  *R.R. Donnelly & Sons Co. v. Fagan*, 767 F.Supp. 1259, 1269 (S.D.N.Y. 1991).  "It has been uniformly held that general knowledge, skill, or facility acquired through training or experience while working for an employer appertain exclusively to the employee.  The fact that they were required or developed during employment does not, by itself, give the employer a sufficient interest to support a restraining covenant."  H. Blake, Employee Agreements Not to Compete, 73 Harv. Law. Review 625, 652 (1960).

California's anti-gag rule for employees is not absolute.  While the default rule is that information and ideas are owned by no one, *Sunpower v. SolarCity Corp.*, 2012 WL 6160472, *4 (N.D. Cal. Dec. 11, 2012), the positive law establishes certain categories of information that are nevertheless entitled to protection.  Attorneys and doctors cannot disclose confidences.  California's right to privacy was enacted to give individuals "the ability to control circulation of personal information."  *White v. Davis*, 13 Cal.3d 757, 774 (1975).  Through the U.S. Constitution, copyrighted works and patents are initially owned by their creators.  Labor Code § 232.5(d) states that the rule prohibiting employers from requiring employees to refrain from disclosing information about their working conditions "is not intended to permit an employee to disclose proprietary information, trade secret information, or information that is otherwise subject to a legal privilege without the consent of his or her employer."  And, of course, bona fide trade secrets are protected by trade secret statutes, though evidence of illegal conduct is never a trade secret because "[t]here is no objectively 'reasonable' method for concealing information about ongoing illegality."  *Alderson v. U.S.*, 718 F.Supp.2d 1186, 1200 (C.D. Cal. 2010).

Plaintiff alleges that Juul Labs' Gag Rules restrict speech, protected activity, and the disclosure of information far beyond the limited categories of information protected by positive law, and, therefore, violate California's anti-gag rule.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### B.     Juul Labs' Gag Rules

The Gag Rules at issue in this case include the following:

#### 1.     The NDAs

As a condition of beginning employment, Juul Labs requires its employees to sign a standard non-disclosure agreement ("Employment NDA"). (Ex. 2).[1]  The Employment NDA prohibits employees from *ever* disclosing or using "Confidential Information," which Juul defines as essentially everything concerning Juul.  Confidential Information includes, for example, "information disclosed by the Company to Employee" and "information developed or learned by Employee during the course of employment with Company."  The Employment NDA also includes a non-disparagement provision that prohibits employees from disclosing or using "all information of which the unauthorized disclosure could be detrimental to the interests of the Company, <u>whether or not</u> such information is identified as Confidential Information."[2]

Juul Labs requires similar agreements when an employee is leaving its employ.  Pursuant to the Employment NDA, all employees must sign an exit (or termination) certification upon departure in which they promise to comply with the NDA in the future, and keep confidential knowledge, data, and information "pertaining to any business of the Company or any of its employees, clients, consultants, or licensees." (Ex. 2 (ex. C)).

Plaintiff alleges that Juul's separation, severance, and option agreements ("Release NDAs") are similarly targeted at silencing employees.  The Release NDAs require that employees "refrain from any disparagement, libel or slander of EMPLOYER and any of the other Releasees [which includes Juul, as well as its shareholders (e.g., Altria), partners, directors, employees, etc.]." (Ex. 3).  It also prohibits employees from participating or assisting "in any court, agency, or investigative or administrative body against any Releasee with respect to any act, omission, practice, conduct, event or any other matter occurring up to and including the date on which EMPLOYEE signs this Agreement," though, as partially detailed below and as noted by the

---

[1] All Exhibits are attached to the Baker Declaration.

[2] This Court has determined that, while this provision is not facially unlawful (Dkt. # 23, p. 8), Plaintiff stated a plausible claim that it could be interpreted as violating the Labor Code. (Dkt. # 42, pp. 10-13).

1   Court, this provision also carves out certain "protected activities." (see Dkt # 23, p. 10).  The

2   Release NDA also requires employees to release claims under the Fair Employment & Housing

3   Act in exchange for wages, a bonus or continued employment, in violation of Government Code §

4   12964.5. (Ex. 3).

5               *2.       The Policies*

6               Plaintiff alleges that Juul Labs' employment policies also prohibit protected speech and

7   activity.  For example, its "External Communication Policy" defines a "Company

8   Communication" to "generally include any situation where JUUL Labs Personnel [e.g.,

9   employees] exercise any influence or control over a communication." (Ex. 4).  It forbids various

10  Company Communications to third parties without prior approval, and it states that "all [not just

11  company] communications with government, regulatory, non-governmental, or other public

12  bodies" must only be made by authorized personnel. (Ex. 4 (emphasis added)).  "All requests

13  from the media for information, including interviews, must be referred to press@juul.com and

14  managed by the Chief Communications Officer." (Ex. 4 (emphasis added)).  "When JUUL Labs

15  Personnel take part in discussions in a public forum,[3] they must ensure . . . that any responses

16  provided do not contradict Company statements and do not reflect poorly on the Company."

17  And, as a catch all, this policy states that "[c]onfidential information . . . and any other

18  information obtained during the course of employment must not be disclosed or used in any

19  Company Communication or personal communication without prior approval." (Ex. 4 (emphasis

20  added)).

21              Juul's IT Policy and Procedure (detailed in the employee handbook) also prohibits

22  electronic communications (including from personal devices used on Juul's premises or in

23  performing Juul business) "that [are] discriminatory, harassing, defamatory, obscene, indecent,

24  threatening, or that otherwise could adversely affect any individual, group, or entity (e.g.,

25  sexually explicit or racial messages, jokes, or cartoons)," that violate company policy (including

26  Juul's other Gag Rules), or that are "contrary to the best interests of Juul Labs." (Ex. 5 (emphasis

27

28  ---

[3] Juul Labs contends that this sentence, when read in context, only applies when a Juul Labs employee is invited to participate in a public forum or speaking engagement on behalf of Juul Labs.

added)).  Its Social Media Policy – which broadly defines Social Media to include internal websites, instant messaging, and other forms of online communication –states that "if you decide to post complaints or criticisms, avoid postings that could reasonably be viewed as malicious, libelous, obscene, abusive, or threatening <u>or that are disrespectful to coworkers, customers, competitors, suppliers, or third parties with whom we do business.</u>" (Ex. 6 (emphasis added)).  It also reminds employees "that your postings on social media <u>(just as any written materials and all emails, texts, instant messages and other forms of electronic communications) are potentially discoverable in the event of litigation and could unnecessarily subject both you and the company to liability.</u>" (Ex 6 (emphasis added)).  Of course, the *manner* of a communication should be irrelevant to liability.  A phone call directing an employee to engage in unlawful conduct is just as illegal as a text message that does the same thing.  Plaintiff alleges that the Gag Rules focus, not on stopping conduct giving rise to liability, but on concealing such conduct.[4]

Juul, of course, disputes Plaintiff's interpretation of its policies and agreements. (See Dkt # 12, 17, 33, 37, 44).

> 3.      *Ambiguity and the "Saving Provisions"*

Certain (but not all) of the Gag Rules include language or provisions that Juul Labs relies on to argue that, despite their all-encompassing language, the Rules only apply to categories of information protected by positive law.  At best, these "saving provisions" create ambiguity, and Plaintiff contends the ambiguity itself chills protected speech. *Reno v. ACLU*, 521 U.S. 844, 871 (1997) (explaining that vague prohibitions have "an obvious chilling effect on free speech"); *Pereyra v. Guaranteed Rate, Inc.*, 2019 WL 2716519, * 8 (N.D. Cal. June 28, 2019) (refusing to enforce fee provision because it "may well have a chilling effect on employees seeking to vindicate their rights").

For example, the Social Media Policy states that it "is not intended to preclude or dissuade employees from engaging in activities protected by state or federal law, including the National Labor Relations Act. . . ."  However, the Social Media Policy goes on to state that federal and

---

[4] Juul's Employee Handbook also instructs employees that "face to face dialogue is our preferred method for real communication." (Ex. 5).

state laws and regulatory requirements that apply to Juul may "change from time to time" and be "complex in application," and it states employees should seek guidance from Juul's Legal Department "regarding the Laws that govern their conduct on behalf of the Company, as well as any specific questions or concerns about whether a potential course of action generates compliance concerns." (Ex.6 (emphasis added)).  Requiring an employee to check with a corporate legal department with "questions or concerns" prior to engaging in protected activities on social media inevitably chills that activity.[5]  *Cf.* (Dkt # 42, p. 22) (explaining, with respect to the External Communication Policy, that placing prior restraints on certain employee speech by requiring prior company approval interferes with Labor Code rights).

Similarly, Juul Labs' Release NDA, in the *first* sentence of section 4(d), expressly prohibits employees from participating "in any court, agency, or investigative or administrative body" against Juul Labs.  The *third* sentence of the same section, however, states it does *not* prohibit employees from "filing a charge or complaint or otherwise disclosing relevant information to or communicating, cooperating, or participating with any state, federal, or other governmental agency." (Ex. 3).  So which is it?  A prudent employee – who may be fearful of being sued – may honor the first sentence and ignore the third.  Thus, the potential chilling effect.

Juul's External Communication Policy states that personal communications are outside the scope of the Policy, but only "so long as they contain no more than a neutral, passing reference of the Company or its products, staff, policies, research, relationships, or competitors." (Ex. 4).  "Any other external communications that refer to the Company [etcetera] are subject to the Policy."  (Ex. 4 (emphasis added)).  The express (and extremely limited) exception for one type of personal communication establishes the broad and chilling scope of the External Communication Policy as a whole.

Finally, Juul's Compliance and Reporting Policy and Code of Conduct arguably contradict, at least part, its Gag Rules with respect to whistleblowing.  These policies require or encourage employees to internally report good faith concerns about violations of either the law or

---

[5] Juul Labs disputes Plaintiff's interpretation of its Social Media Policy and contends that certain language is being taken out of context.

Juul Labs' policies.[6]  However, because Juul's policies include its Gag Rules, and (as Plaintiff contends) the Gag Rules prohibit external <u>and</u> internal written communications adverse to Juul's interests, the potential chilling effect remains, even for internal whistleblowers.  Plaintiff argues that the only way for an employee to comply with both the reporting policy and the Gag Rules is to report concerns orally, thus creating no record, and that was precisely Juul's point.

### 4.    The Practices

Plaintiff alleges that Juul Labs' employment practices further confirm that its Gag Rules violate California law.  For example, its employment policies – including its External Communication Policy, Social Media Policy, and Code of Conduct – are all "working conditions" within the meaning of Labor Code § 232.5.  However, Juul Labs labels each of these policies as "Confidential Information," though the policies themselves are not legally protectible. (*E.g.,* Exs. 4,6).

Plaintiff further alleges that, in all-hands meetings and other company-wide communications, Juul's senior executives and lawyers instructed employees both to not speak to the press and to not put anything in writing that could be communicated in person. (1AC ¶ 64).  Executives also instructed employees to not get involved in political issues arising from Juul's presence in San Francisco, the sale of its products there, or the vaping epidemic.  Juul's "prevention by design" training program further instructed employees – even in their personal capacities – to never engage with youth on the topics of tobacco or nicotine, to not respond to a young family member seeking advice on smoking, and to not engage in social media (even to correct alleged misinformation about Juul Labs). (Ex. 7).

Finally, in anticipation of government inspections, Juul Labs trained employees to conceal information from regulators.  They ran drills in which they would conceal incriminating evidence from plain view. (1AC ¶ 61).  They were instructed to not disclose information to inspectors, but rather to direct them to specifically identified individuals. (*Id.* at ¶ 62).  These individuals, in turn, were taught to be technically truthful while concealing information from government regulators. (*Id.*).

---

[6] Juul Labs contends these policies apply to external whistleblowing as well.  Plaintiff disagrees.

Hamilton and Isaacson also allege they were retaliated against for violating the Gag Rules and engaging in internal whistleblowing. (1AC ¶¶ 65-67).

Juul has denied these allegations.  (Dkt. # 44, at ¶¶ 51–52, 60–67.)

**C.      Litigation to Date**

This case, first filed in June 2020, has been hard fought.  Juul Labs filed two motions to dismiss, two motions to strike, and accompanying requests for judicial notice, all of which Plaintiff opposed.  Juul also has consistently resisted discovery.  There have been numerous discovery disputes that have led to extensive meet and confer efforts, joint letter briefs, supplemental briefs, competing and detailed discovery plans, and Court rulings (either from the bench or in written orders).  To date, Juul Labs has produced more than 28,000 pages of documents and responded – at least in part – to several rounds of written discovery.  (Baker Decl. ¶ 6).

The parties resumed settlement discussions after rulings partially favorable to both parties with respect to Juul's second motion to dismiss, the form of the protective order, and the scope, timing, and deadlines for discovery. (Baker Decl. ¶ 7).  Plaintiff has assumed, in valuing the case for purposes of settlement, that additional discovery would further support her allegations. (Baker Decl. ¶ 6).  Juul, for its part, continues to deny that any of its agreements, policies, or alleged practices violate the Labor Code.

**D.      Recent Changes to the Gag Rules**

Juul has already changed a number of the policies and agreements at issue in this case. According to document metadata, about a month after Plaintiff filed her original complaint, Juul Labs began using a new NDA for new hires. (Baker Decl. ¶ 2.h, Ex. 8).  Unlike the Employment NDA, the new NDA contains a narrowed definition of "confidential information," a narrowed non-solicitation clause, an express notice of immunity under the Defend Trade Secrets Act, and express carve-outs for "protected activity."  The new NDA also does not require a termination certification. (Ex. 8).

Also according to document metadata, about five weeks after this Court's January 27, 2021 order on Juul Labs' second motion to dismiss, the company published a new 75-page

document entitled "Code of Conduct and Global Compliance Policies" ("the Code and Policies").[7] (Baker Decl. ¶ 2.i, Ex. 9).  The new Code and Policies seemingly modify the Gag Rules.  For example, many of the new Policies expressly mention the right to engage in "protected activity," which the Code and Policies define as including: (1) "discussing or disclosing terms, wages, or other working conditions (except when the working conditions themselves constitute a trade secret)" and "disclosing information when Juul Labs Personnel have reasonable cause to believe that a violation of or noncompliance with a local, state, or federal rule or regulation has occurred."  The Code and Policies now also state: "You are not required to obtain authorization from Juul Labs or to inform Juul Labs prior to engaging in any Protected Activity." (Ex. 9).

These changes potentially entitle Plaintiff to catalyst fees.  Juul, for its part, asserts its policies and agreements were in the process of being updated in the usual course of business independent of this litigation.  Regardless, in Plaintiff's view, the changes do not go far enough.  For example, any current or former employee who signed the original Employment NDA or Release NDA remains bound by them.  Plaintiff contends the new Code and Policies also continue to restrict (through, at a minimum, ambiguity) certain employee rights; e.g., the right to communicate about Juul externally in a manner that involves more than a neutral reference to the company (Ex. 9, § 2.1), or the right to engage in political activity adverse to Juul's alleged interests. (Ex. 9, § 4.3.3.4).

### E.    The Settlement

After extensive negotiations, assisted in part by mediator Mark Rudy, the parties executed the PAGA settlement on August 30, 2021. (Ex. 1).  Here are the material terms.

#### 1.    The PAGA Group Members

The settlement resolves specific PAGA claims arising from the Gag Rules as they relate to Juul Labs' non-Executive,[8] California-based, employees for the Covered Period. (Settlement §

---

[7] Version 1 of the Code and Policies (with metadata dated March 4, 2021) was labeled as "Confidential Information."  This designation was removed a few weeks later in version 2 of the Code and Policies.  (Baker Decl. ¶ 2.i).

[8] "Executives" – defined as current and former C-level officers and their counterparts – are excluded from the settlement. (*Id.* at § I.F)  It is incongruous to conclude that the most senior

1
2
I.L-M).  At the time of the settlement, there were 1,654 such employees (i.e. "PAGA Group Members"): 1145 former employees and 509 current employees. (*Id.* at § II.C).

3
4
5
6
7
8
9
In determining whether an employee is California-based, the settlement looks to their residential address during the Covered Period. (*Id.* at § I.P).  Because at least some employees – like PAGA Representative Isaacson – reside outside of California but worked pay periods within the State's geographic boundaries, the settlement also creates a 2% reserve fund  and a challenge procedure (*Id.* at § III.F.3-4) for employees who contend they were not properly included as a PAGA Group Member,[9] or that the number of pay periods they worked in California is inaccurate.

10
11
12
13
The Covered Period is from August 10, 2018 through the date of settlement approval. (*Id.* at § I.E).  If the final number of PAGA Group Members or pay periods is 10% or more than the numbers provided by Juul Labs at the time of settlement, then the settlement payment will be increased by the amount of the discrepancy.  (*Id.* at § II.C).

14
### 2.    The Settlement Payment and Plan of Allocation

15
16
17
18
19
20
21
22
The settlement amount is equal to $34.03 multiplied by the total number of employee pay periods.  Juul represents, and Plaintiff has confirmed, that there are 65,236 total pay periods through August 27, 2021. (*Id.* at § III.A).  This means the total settlement amount is $2,219,981.08.  Of this amount, the settlement allocates $1,000 per employee to the PAGA claims under Labor Code §§ 98.6 and 1102.5(a).[10]  (*Id.* at § III.B.2).  The remainder is allocated on a per-employee-pay-period basis to the other PAGA claims.  After any court-approved deductions from the common fund, and consistent with Labor Code § 2699(i), 75% of the settlement amount goes to the LWDA, and 25% of the settlement amount goes to the PAGA

23
24
executives responsible for adopting and enforcing the Gag Rules are at the same time "aggrieved" by the Rules within the meaning of PAGA.  *See* Labor Code § 2699(b) (defining aggrieved employees).

25
26
27
[9] The parties disagree on whether non-California residents can be aggrieved employees within the meaning of PAGA.  This Court suspects, at a minimum, that Plaintiff faces "a pretty stiff challenge" in establishing that PAGA applies to employees who worked outside of California. (6.24.2021 Hearing Transcript, pp. 10-13).

28
[10] Labor Code §§ 98.6(b)(3) and 1102.5(f) each provide a civil penalty "not exceeding $10,000" on a per employee (not per pay period) basis.  The default per-employee-pay-period-penalty does not apply to these Labor Code violations.  See Labor Code § 2699(f).

Group Members. (*Id.* at § III.B.1-2).  *However*, and as detailed below, the penalty amount attributable to current employees – $956,140.91 – will be suspended and forgiven over a two-year period provided Juul Labs substantially complies with the required programmatic relief.  (*Id.* at § III.B.4).

If approved by the Court, CAC Services, a third-party settlement administrator, will calculate each PAGA Group Member's settlement share, mail the settlement checks, and otherwise administer the settlement.  (*Id.* at §§ III.E.3. III.F.1; Baker Decl. ¶ 2.m, Ex. 13).  Any deductions from the common fund for attorney and administrator fees and costs, as well as for service payments to the PAGA Representatives, are subject to court approval. (*Id.* at §§ III.B.3, E.2).  CAC has provided a "not-to-exceed bid" of $8,000 to administer the settlement. (Baker Decl. ¶ 2.m).  There is no clear-sailing provision.

### 3. The Programmatic Relief

The settlement requires that former employees receive a court-ordered notice with their settlement checks. (*Id.* at § III.C.1).  The notice states that, notwithstanding any Juul agreement or policy to the contrary, the employee has the right to engage in specified conduct, including: (1) the right to whistle blow consistent with Labor Code § 1102.5, Government Code § 12964.5, and the Federal Defend Trade Secrets Act; (2) the right to speak about wages, working conditions, and political issues consistent with Labor Code §§ 232, 232.5, 1101-02, and 1197.5; and (3) the right to compete consistent with Business & Professions Code § 16600. (*Id.* at Exhibit A).  The notice also states: "JUUL LABS WILL NOT RETALIATE AGAINST YOU FOR, NOR INTERFERE WITH, YOUR EXERCISE OF THESE RIGHTS." (*Id.*).  The notice also explains each employee's settlement payment and notifies them of the challenge procedure if they believe their California pay period information is inaccurate.  (*Id.*).

The settlement also requires Juul Labs to modify the agreements, policies and other written instruments that formerly contained the Gag Rules (to the extent not previously modified) so that they unambiguously inform Juul's current employees of nine protected activity principles. (*Id.* at III.C.2).  The principles are worth quoting in full:

a. These instruments do not prohibit or prevent the disclosure of information about reasonably suspected violations of the law to government agencies or public bodies (as permitted by Labor Code § 1102.5) or other third parties (to the extent permitted by Government Code § 12964.5), except when the employee's knowledge of the information arises solely from communications protected from disclosure by Defendant's attorney-client privilege.

b. These instruments do not prohibit or prevent the disclosure of information about reasonably suspected violations of the law, internally and in written form, to persons within Defendant's organization who have the authority to address the violation.

c. These instruments do not prohibit or prevent political speech or activities, as provided by Labor Code §§ 1101-1102, by employees acting in their personal capacities.

d. These instruments do not prohibit or prevent the disclosure or discussion of their own wages, or the wages of others as permitted by Labor Code §§ 232 and 1197.5(k), but only in a manner consistent with each employee's constitutional right of privacy.[11]

e. These instruments do not prohibit or prevent the disclosure of information about working conditions, except when that information constitutes a bona fide trade secret or proprietary information of Defendant or is otherwise subject to a legal privilege, consistent with Labor Code § 232.5.

f. These instruments do not prohibit or prevent the disclosure or use of the employee's general skills, knowledge, or acquaintances learned during the course of their employment, nor disclosure or use of information that is readily available to a competitor through lawful competition means. However, the instruments can and do prevent the unlawful use or disclosure of trade secrets and information protected from disclosure by California or federal law.

g. Employees have the rights identified in the notice of immunity set forth in the Defend Trade Secrets Act, 18 U.S.C. § 1833(b).

h. Employees are not required to give Defendant notice or seek its approval prior to engaging in the protected disclosures or uses permitted in Section III.C.2.a-g.

i. Employees will not release any claims under the California Fair Employment Housing Act in exchange for a raise, a bonus, or initial or continued employment provided, however, that this does not apply to agreements that fall within an exception to Government Code § 12964.5.

(*Id.* at § III.C.2.)

---

[11] While Labor Code § 1197.5(k) states "an employer shall not prohibit an employee from disclosing the employee's own wages, discussing the wages of others, [or] inquiring about another employee's wages," employees have some constitutional privacy interest in their own financial information.  *Valley Bank of Nevada v. Superior Court*, 15 Cal.3d 652, 656 (1975). The protected activity principle concerning wages does not, for example, entitle an HR person to gratuitously disclose the wages of a named rank-and-file Juul employee on the internet.

1     In addition to modifying the instruments, the settlement also requires Juul to: (a)

2   affirmatively announce the nine principles to its workforce, (b) create and maintain a dedicated

3   webpage setting forth the principles, and (c) not act contrary to the principles.  (*Id.* at § III.C.3.a).

4   If Juul Labs subsequently communicates with its departed or departing employees about their

5   confidentiality obligations, Juul Labs "shall at the same time provide the employee with a copy of

6   the [nine principles] announcement." (*Id.* at § III.C.3.b).

7     Finally, at six-month intervals during the two-year suspension-and-forgiveness period,

8   Juul Labs must certify under penalty of perjury its ongoing compliance with the nine principles.

9   (*Id.* at § III.C.4).  Any party to the settlement, as well as the LWDA, may bring a motion to

10   enforce the settlement terms.  (*Id.* at § III.G.6).

11                  *4.      The Suspension, Forgiveness and Cure Provisions*

12     As noted above, provided that Juul Labs complies with the required programmatic relief,

13   its obligation to pay the penalty amount attributable to current employees will be immediately

14   suspended and then forgiven on a monthly basis over a two-year period. (*Id.* at § III.B.4).

15   However, if, after being given an opportunity to cure, a party moves to enforce the settlement and

16   the Court concludes that Juul Labs has breached its obligations, then the Court may order an

17   appropriate remedy.  Depending on the circumstances, and in the Court's discretion, this remedy

18   may include the payment of some or all of the suspended penalty amount, specific performance, a

19   curative notice to the aggrieved employees, and attorneys' fees.  (*Id.* at §§ III.C.5, III.G.6).

20                  *5.      The Settlement Release*

21     In exchange for the settlement benefits, Hamilton and Isaacson, on behalf of themselves,

22   the LWDA, and "to the maximum extent permitted by law, the PAGA Group Members,"[12] agree

23

24   [12] While PAGA settlements regularly purport to do so, Plaintiff doubts that a court can validly
     release the PAGA rights of individuals over whom it lacks personal jurisdiction and who have not
25   received notice of the settlement.  *Mathews v. Eldridge*, 424 U.S. 319, 322 (1976).  Accordingly,
     the release language only permits the release of claims by PAGA Group Members "to the
26   maximum extent permitted by law."  That said, it is the intent of the parties that the final
     judgment approving the settlement will have a res judicata effect if another PAGA Representative
27   ever brings a lawsuit asserting the released PAGA claims.  (*Id.* at § III.D.1); *E.g., Arias v.
     Superior Court* 46 Cal.4th 969, 932-34 (2009) (explaining that, through the doctrines of collateral
28   estoppel and res judicata, "nonparty employees as well as the government are bound by the
     judgment in an action under the act.").

to release the specified PAGA claims that "were or could have been asserted in the Action based upon the factual allegations asserted in the Complaint and/or any PAGA Notice submitted to the LWDA by the PAGA Representatives." (*Id.* at § III.D.1).[13]  The PAGA Representatives (Hamilton and Isaacson), but <u>not</u> the LWDA or any other PAGA Group Member, also waive their individual rights under Civil Code § 1542 with respect to the released PAGA claims. (*Id.* at § III.D.2).  The settlement also states that Hamilton releases her non-PAGA claim for a public injunction under the unfair competition law. (*Id.* at § III.D.1).

### F.    The Maximum Exposure and Case Value

The undiscounted, fully stacked, value of Plaintiff's surviving PAGA claims assumes: (1) Liability; (2) $20,000 in civil penalties per employee for the two PAGA claims under Labor Code §§ 98.6 and 1102.5; (3) $500 per employee pay period for the initial violation of the five PAGA claims under Labor Code §§ 96(k), 232.5, 432.5, 1101 and 1102; (4) $1,000 per employee pay period for each subsequent violation of these five Labor Code sections;[14] and (5) no discretionary reduction in penalties.

Based on these assumptions, the maximum exposure is this:

| | |
|---|---|
| Former Employees | $59,466,500 |
| Current Employees | $38,022,500 |
| **Total** | **$97,489,000** |

(Baker Decl. ¶ 8).

Thus, the settlement – for around $2.22M – results in a recovery of about 2.2% of the maximum exposure if Juul Labs does not comply with the programmatic relief, and about 1.3% of the maximum exposure if Juul does comply.[15]

---

[13] This Court approved similar release language in *Bankwitz v. EcoLab*, Case No. 17-cv-02924 (N.D. Cal.) (see Dkt ## 134, 137, 143 (January 7, 2021))

[14] Labor Code § 2699(a)(3) provides a $100 civil penalty per-employee-pay-period for the initial violation, and a $200 civil penalty per-employee-pay-period for each subsequent violation, for each of these five Labor Code sections.

[15] If the dismissed claims under Labor Code §§ 232 and 1197.5 are included in the exposure calculations, the maximum exposure jumps to $123,489,600. (Baker Decl. ¶ 8).

Juul Labs disputes each of the assumptions set forth above.  Plaintiff recognizes that many of the assumptions rest on unresolved legal and factual issues.  As a result, the actual case value is less than the maximum exposure. (Baker Decl. ¶ 9).

Most significantly, while the award of PAGA penalties is mandatory and fixed by statute, *Amaral v. Contas Corp. No. 2*, 163 Cal.App.4th 1157, 1211, 1213 (2008), the manner in which those penalties are calculated is much disputed.

For example, Plaintiff's maximum exposure analysis assumes the stacking of penalties by Labor Code section.  *E.g.*, *O'Conner v. Uber Technologies*, 2016 WL 3548370, * 7 (N.D. Cal. June 30, 2016) (stating that the parties should not ignore stacking when calculating PAGA penalties).  This assumption is subject to challenge.  *E.g.*, *Snow v. United Parcel Services, Inc.*, 2020 WL 1638250, *3 (C.D. Cal April 1, 2020) ("plaintiffs may only recover a set of civil penalties for each type of violation."); *Salazar v. PODS Enterprise, LLC*, 2019 WL 2023726, *6 (C.D. Cal. May 8, 2019) ("it is possible (although highly unlikely) that [plaintiff] could recover PAGA penalties for each separate type of Labor Code violation"); *Smith v. Lux Retail North America*, 2013 WL 2932243, * 4 (N.D. Cal. June 13, 2013) (questioning whether it was "really plausible that we would pile one penalty on another for a single substantive wrong").  If PAGA penalties are stacked by cause of action (and not by Labor Code section), then the maximum exposure drops to $71,725,400.  If, as Juul Labs contends, the PAGA penalties cannot be stacked at all, then the exposure drops precipitously to $12,881,800.

Juul Labs also argues that it cannot face a "subsequent" violation under PAGA's default penalty provision – resulting in a $200 per pay period penalty -- without first being found liable for an "initial" violation.  Plaintiff disagrees.  *E.g.*, *O'Conner*, *supra*, 2016 WL 3548370 * 7 (explaining that plaintiffs should calculate subsequent pay periods by $200, not $100).  However, there is case law supporting Juul's argument, at least with respect to all pay periods prior to the PAGA notice.  *E.g., Steenhuyse v. UBS Financial Services, Inc.*, 317 F.Supp.3d 1062, 1067-68 (N.D. Cal. 2018).  If Juul Labs is correct that: (1) the penalties in this case cannot be stacked, and (2) it cannot be held liable for "subsequent" violations under the default penalty provision, then the exposure drops to $6,523,600.

Finally, this Court is authorized to reduce the maximum PAGA penalty "if, based on the facts and circumstances of the particular case, to do otherwise would result in an award that is unjust, arbitrary and oppressive, or confiscatory."  Labor Code § 2699(e)(2).  Case law suggests that the mandatory award of civil penalties is appropriately reduced as "unjust" when the employer, upon learning of the legal violations, acts to correct them.  *E.g., Magadia v. Wal-Mart Associates, Inc.,* 384 F.Supp.3d 1058, 1104 (N.D. Cal. 2019) (80% reduction in PAGA penalties where the amount requested by the plaintiffs "would be unjust and oppressive, and . . . a significant reduction is appropriate [because] California courts have held that a defendant's attempt to comply with the law is a basis for reduction in a PAGA penalties award"); *Cf. Amaral, supra*, 163 Cal.App.4th at 1214 (declining to reduce penalties in light of defendant's "cavalier approach" to fulfilling its statutory obligations).  Here, the evidence suggests that Juul Labs began using a new NDA after Plaintiff filed suit, and implemented a new Code and Policies after the Court ruled on Juul's second motion to dismiss. (Baker Decl. ¶¶ 2.h-i, 9).  While Plaintiff contends this was too little too late, the Court may ultimately disagree.  If Juul Labs succeeds on the stacking and subsequent violation issues, and if the Court reduces the penalties by 50% in light of a "non-cavalier approach" to Juul's Labor Code obligations, the exposure drops to $3,261,800.

And all of this assumes Plaintiff will ultimately establish liability (Baker Decl. ¶ 10), which Juul Labs also vigorously disputes.

### G.    Comparable Settlements

To date, PAGA claims are usually resolved for far less than their maximum exposure. Including the present settlement, Plaintiff is aware of four settlements of PAGA claims concerning illegal gag rules, three of which were negotiated by Plaintiff's Counsel.  These settlements range from about $500 per-pay-period to likely pennies per-pay-period, with different terms for programmatic relief.  They are summarized in this chart.

| Case | Amount Per Pay Period | Programmatic Relief | Status |
|------|----------------------|---------------------|--------|
| *Lai v. Binary Capital Management,* Case No. 17-CIV-02882 (San Mateo Superior Court, 2020). | @ $500 per pay period (nine PAGA Group Members). | Injunctive relief preventing enforcement of NDAs and notice to the PAGA group members. | Settlement approved |
| *Rosetta v. Paycom*, Case No. 2:19-cv-8994-AS (C.D. Cal. 2021). | @ $80 per pay period (about 225 PAGA Group Members) | Programmatic relief including revisions to agreements and policies so that they comply with the law, an agreement to not enforce NDAs in a manner contrary to California law, and notice to the PAGA members. | Settlement (which includes class claims) granted preliminary approval. |
| **Hamilton v. Juul Labs (the present case)** | **@ $34.00 per pay period (1654 PAGA Group Members)** | **Extensive programmatic relief obligations, including notice to PAGA group members** | **Settlement before this Court** |
| *Moniz v. Adecco*, Case No. 17-CIV-01736 (San Mateo Superior Court, 2020) (appeal pending). | No pay period data, but per employee penalty is either $630 (for permanent employees) or $41 (for temporary employees). | Notice to PAGA group members and agreement to revise gag rules in undetermined way at an undetermined time. | Settlement approved over the objections of the LWDA and an aggrieved employee. Appeal pending. |

(Baker Decl. ¶ 4).

For other settlement comparators, the PAGA claims perhaps most closely analogous to those challenging gag rules are those involving suitable seating violations. Both gag rule and seating claims do not involve ordinary wage-and-hour violations (the traditional subject of PAGA claims). Rather, they involve Labor Code provisions concerning employee working conditions. Suitable seating PAGA settlements have ranged from about $30 per employee pay period to less

1  than a dollar per employee pay period.[16] (Ex. 12).

2      This Court is rightfully skeptical of deeply discounted PAGA settlements.  It has rejected

3  a proposed resolution of PAGA claims for 0.1% of the maximum PAGA exposure.  *O'Connor v.*

4  *Uber Technologies, Inc.*, 201 F.Supp.3d 1110, 1135 (N.D. Cal. 2016).  It has approved, on the

5  other hand, the settlement of PAGA claims for as low as 0.15% of their maximum value in unique

6  circumstances: Where, among other things, the settlement taken as a whole vindicates employee

7  rights and may have a deterrent effect on the defendant employer and others.  *Viceral v. Mistras*

8  *Group, Inc.,* 2016 WL 5907869, * 9 (N.D. Cal. Oct. 11, 2016).

9  **IV.   ARGUMENT**

10     **A.    The Standard of Review**

11     Labor Code § 2699(l)(2) states that the court "shall review and approve any settlement of

12  any civil action filed pursuant" to PAGA.  The statute does not provide a settlement review

13  standard, and there is virtually no guidance on the subject from the California appellate courts

14  (other than the California Supreme Court's observation, in *Williams v Superior Court*, 3 Cal.5[th]

15  531, 548 (2017), that a court should ensure "any negotiated resolution is fair to those affected").

16     In *O'Connor*, this Court established the standard typically relied upon by trial courts in

17  deciding whether to approve a PAGA settlement.  The ultimate inquiry is whether the PAGA

18  settlement "is fair and adequate in view of the purposes and policies of the statute."  *E.g., Id.*,

19  *supra*, 201 F.Supp.3d at 1135.  In making this determination, a court should closely examine the

20  settlement and its surrounding circumstances.  It may also use a sliding scale.  For example, a

21  settlement that substantially furthers one PAGA purpose, but not another, might still merit

22  approval when the settlement is viewed as whole.  *Id.*  It stands to reason that a PAGA

23  representative, in negotiating a settlement, can engage in the same sliding scale analysis.  She can

24  rightfully conclude that it more important to prioritize one PAGA purpose over others and

25  negotiate the settlement terms accordingly.

26     The purposes and policies of PAGA, which to some degree interlock, are to:

27

28  ───────────────
[16] Note there is no stacking of penalties with respect to suitable seating violations because only
one Labor Code section is involved.

(1) Protect workers and law-abiding employers by ensuring compliance with the State's minimum labor standards.  This is done by remediating present Labor Code violations and deterring future violations by both the defendant and other employers.

(2) Collect civil penalties to enhance the State's labor enforcement capabilities and educate workers; and

(3) Incentivize private enforcement of the Labor Code, while also ensuring the enforcement primacy of the LWDA.

*Id.* at 1133-35; *Kim v. Reins Int'l California, Inc.*, 9 Cal.5th 73, 86 (2020); *Iskanian v. CLS Transportation Los Angeles, LLC*, 59 Cal.4th 348, 379 (2014).  As part of the review process, the Court must also ensure the settlement:

(4) Has a rational basis in view of the strength and full value of the PAGA claims; and

(5)  Is neither collusive nor unfair to those affected.  *O'Conner, supra*, 201 F.Supp.3d at 1134-35; *Williams, supra*, 3 Cal.5th at 548.

Applying these factors, the settlement should be approved.

**B.      The Settlement Protects Workers by Remediating Present Violations and Deterring Future Ones**

The programmatic relief established by the settlement entirely remediates Juul Labs' alleged present violations of California's anti-gag rule for employees, a minimum employment standard that protects both workers and the public.  *Doe v. Google Inc.*, *supra*, 54 Cal.App.5th at 961.  The settlement also deters future violations by Juul Labs.  The company must certify its ongoing settlement compliance under penalty of perjury over a two-year period.  If Juul Labs fails to comply with its settlement obligations, it risks being required to pay the suspended penalty amount and further court intervention.

In addition to deterring present and future Labor Code violations by Juul Labs, the settlement also deters similar Labor Code violations by other employers (particularly large ones).  A $34.00 per-employee-pay-period penalty is substantial in the scheme of things.  Juul, relatively speaking, has a small California workforce.  An employer with a workforce ten times larger than Juul's – with about 16,000 employees – would be required to pay $22M if it entered the same

1  settlement as Juul.  The settlement thus sets a significant benchmark by which any future PAGA

2  settlement will be judged.  *Cf,* MANAGING CLASS ACTION LITIGATION: A POCKET GUIDE FOR

3  JUDGES at 13-14 (3rd Ed. 2010).  A rational employer will hopefully conclude that it is better to

4  voluntarily comply with California's anti-gag rule than risk such future liability.

5        **C.**     **The Settlement Collects Adequate Civil Penalties**

6        Assuming Juul complies with the programmatic relief, the gross penalty amount

7  immediately due is $1,263,840.17, inclusive of not-yet-determined fees, costs, and service

8  payments.  According to Plaintiff's analysis of settlement and penalty data from the LWDA, this

9  amount is in the 98th percentile of gross PAGA penalties recovered by court approved

10  settlements.  (Baker Decl. ¶ 2.j, Ex. 10).  If the settlement amount is calculated on a per employee

11  basis (as opposed to a gross or per-pay-period basis), then the recovery is in the 91st percentile.[17]

12  (*Id.*).

13        Admittedly, these figures likely say more about the adequacy of other PAGA settlements

14  than it does about the present one.  The LWDA has concluded that 75% of the PAGA settlements

15  it has reviewed "received a grade of fail or marginal pass, reflecting the failure of many private

16  plaintiffs to fully protect the interests of the aggrieved employees and the state." (Ex 11).  Or

17  alternatively, a small gross penalty payment may simply reflect a settlement that appropriately

18  prioritizes non-penalty relief.  This Court has approved a $20,000 civil penalty payment

19  (amounting to .015% of the value of the PAGA claims) in light of the other benefits of the

20  settlement.  *Viceral, supra,* 2016 WL 5907869, * 9.  Under any view, the gross penalty amount

21  provided by this settlement – even with the suspension and forgiveness provisions – enhances the

22  State's labor enforcement capabilities, particularly when compared to other settlements of PAGA

23  claims.

24        **D.**     **The Settlement Incentivizes Private Enforcement of the Labor Code,**
25                     **While Maintaining the LWDA's Enforcement Primacy**

26        The settlement allows the moving parties to seek fees, costs, and service payments from

27

28  ---
[17] The LWDA does not maintain data from which a per-employee-pay-period settlement amount can be readily determined.

the common fund created by the settlement.  Depending on the court-approved amounts, the fee and service awards will incentivize private enforcement of the Labor Code by employees and public interest attorneys.

Also, through its suspension and forgiveness provisions, the settlement provides a financial incentive for Juul to ensure that it continues to comply with the nine principles set forth in the settlement.  If the Court determines that Juul has failed to comply, the aggrieved employees may receive 25% of the suspended settlement amount.  The settlement thus provides current employees with a financial incentive to ensure Juul complies with its settlement obligations.  And because the settlement only releases claims through the date of settlement approval (Ex, 1 at §§ I.E, III.D.1), any subsequent PAGA violation could subject Juul to an entirely new PAGA claim for additional civil penalties.  Finally, if a party to the agreement seeks to enforce the settlement and is the prevailing or successful party in connection with such motion, they can seek fees independent and on top of any potential fee award from the common fund. (*Id.* at § III.G.6).

At the same time the settlement incentivizes private enforcement, it also maintains the LWDA's enforcement primacy.  The release is expressly limited to the specific Labor Code sections identified in the complaint and the factual allegations pled in the Action through the date of approval.  The waiver under Civil Code § 1542 is limited to the moving parties and does not apply to the LWDA.  The settlement also gives the LWDA the right to enforce the terms of the settlement itself. (*Id.* at § III.G.6).

### E.    The Settlement Has a Rational Basis in View of the Strength and Value of the PAGA Claims

The settlement is also adequate when taking into account the strength and value of the PAGA claims.  While the maximum exposure is in the high eight-figures, that exposure is based on assumptions about the manner in which penalties are calculated that are high reward but also high risk.  As detailed above, an adverse ruling on the stacking issue drops the maximum exposure to the low-eight figures.  An additional adverse ruling on the default penalty amount drops the exposure to the mid-seven figures.  And this assumes both a finding of liability and no additional discretionary reduction based on Juul's recent changes to its Gag Rules.

There is also the issue of delay.  (See Baker Decl. ¶ 11).  The settlement provides immediate relief to the aggrieved employees and greatly benefits the public.  It remediates the alleged present violations and provides notice to current and former employees of important rights.  Among other things, the settlement notifies more than a thousand employees that their NDAs do not prevent them from exercising the rights provided by California's anti-gag rule, including the right to whistle blow and speak.  The settlement also provides the immediate payment of substantial civil penalties.  Continued litigation, while it might one day result in greater civil penalties, does not provide these immediate benefits.

**F.      The Settlement Is Neither Collusive nor Unfair to Those Affected**

The settlement and its surrounding circumstances demonstrate that the settlement was not collusive.  The release is not overbroad, there is no clear sailing provision for fees or service payments, and there are no related cases that will be adversely affected by the settlement.  *Cf. Kim v. Allison,* 8 F.4th 1170, 1180 (9th Cir. 2021) (clear sailing provision is an important warning sign of collusion); *Gonzalez v. CoreCivic of Tennessee, LLC*, 2018 WL 4388425 * 12 (E.D. Cal. Sept. 13, 2018) (an overbroad release is evidence of collusion).  The settlement here was only reached after extensive litigation and negotiation (including through a mediator) that first began in August of 2019. (Baker Decl. ¶ 5).

Finally, the settlement is fair to those affected.  Former employees receive notice of their rights, a promise that Juul will not act contrary to those rights (though litigation threats or otherwise), and an immediate 25% share of the civil penalties.  If Juul does not comply with the required programmatic relief, each current employee will also receive a settlement share based on the same calculation.  While the settlement amount as to current employees will be suspended if Juul complies with its obligations, the compliance itself provides current employees with something more valuable than their 25% share of the civil penalties.  It provides them with a job where they are unambiguously free to whistle blow, speak, and compete consistent with California's minimum employment standards.  This is worth the trade.

- 23 -

**V.      CONCLUSION**

     For all the reasons set forth above, the moving parties respectfully request that the Court grant settlement approval.  Plaintiff's request for fees, costs, and service payments from the common fund created by the settlement will be addressed through a subsequent and separate motion.

Dated:   September 30, 2021          BAKER CURTIS & SCHWARTZ, P.C.


By: _____/s/ Chris Baker_____
     Chris Baker
     Attorneys for Plaintiff and PAGA Representative
     MARCIE HAMILTON and JIM ISAACSON