UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARCIE HAMILTON,<br><br>     Plaintiff,<br><br>  v.<br><br>JUUL LABS, INC.,<br><br>     Defendant. | Case No.  20-cv-03710-EMC<br><br>**ORDER GRANTING PLAINTIFF'S MOTIONS FOR PAGA SETTLEMENT APPROVAL AND ATTORNEYS' FEES**<br><br>Docket Nos. 80-81 |

## I.   **INTRODUCTION**

Plaintiff Marcie Hamilton and Private Attorneys General Act ("PAGA") Representative Jim Isaacson ("Plaintiff" for simplicity) filed this lawsuit against Hamilton's former employer, Defendant Juul Labs, Inc. ("Juul"), seeking civil penalties and injunctive relief related to alleged policies, separation agreements and suppression of the whistleblowing and political activities of its employees in violation of California law.  Docket No. 32 ("FAC").

The parties indicate that they have agreed to resolve Plaintiff's PAGA claims through monetary penalties and programmatic relief.  Docket No. 80.  Now pending are Plaintiff's unopposed motions for approval of the PAGA settlement, Docket No. 80 ("Settlement Motion"), and for attorneys' fees, Docket No. 81 ("Fees Motion").

For the following reasons, the Court **GRANTS** Plaintiff's motion to approve settlement, and Plaintiff's motion for fees and awards, subject to the modifications explained below.

## II.   **BACKGROUND**

A.  Legal Basis for Plaintiff's PAGA Claims

Several provisions of California law, taken together, "establish as a minimum employment

1    standard an employee anti-gag rule." *Doe v. Google Inc.*, 54 Cal.App.5th 948, 961 (2020).

2      For example, California law protects whistleblowers.  Labor Code § 1102.5(a) makes it

3    unlawful for an employer to adopt or enforce a policy or rule that prevents employees from

4    disclosing information about reasonably suspected violations of the law to persons with the power

5    to address the problem, *e.g.*, government agencies or another employee who has the authority to

6    investigate, discover, or correct the legal violation.  *Doe*, 54 Cal.App.5th at 958.  Government

7    Code § 12964.5(a) prohibits employers from requiring employees to sign certain non-

8    disparagement agreements or other documents that purport to deny them the right to disclose

9    information to *anyone*, including the press, about any "unlawful or potentially unlawful conduct."

10      California law also protects a broad array of employee speech and activity unrelated to

11    whistleblowing.  Labor Code § 96(k) prohibits employer retaliation for "'lawful conduct occurring

12    during nonworking hours away from the employer's premises,' so employers do not seek to

13    control the non-work aspects of their employees' lives."  *Doe*, 54 Cal.App.5th at 958 (citations

14    omitted).  Labor Code §§ 232, 232.5, and 1197.5(k) generally outlaw employer prohibitions on the

15    disclosure or discussion of wages and working conditions.

16      As the Court previously stated in this litigation, "Labor Code §§ 1101 and 1102 are

17    'designed to protect the fundamental right of employees in general to engage in political activity

18    without interference by their employers.'"  Docket No. 42 at 21).  And California Business &

19    Professions Code § 16600 outlaws contracts in restraint of trade, rendering overbroad or

20    oppressive non-disclosure agreements illegal.  *Brown v. TGS Management Co., LLC*, 57

21    Cal.App.5th 303, 318-319 (2020).

22      California's anti-gag rule for employees is not absolute.  Labor Code § 232.5(d) states that

23    the rule prohibiting employers from requiring employees to refrain from disclosing information

24    about their working conditions "is not intended to permit an employee to disclose proprietary

25    information, trade secret information, or information that is otherwise subject to a legal privilege

26    without the consent of his or her employer."

27    B.  Plaintiff's PAGA Claims

28      Plaintiff alleges that certain of Juul's policies and practices restrict speech, protected

United States District Court
Northern District of California

activity, and the disclosure of information beyond the limited categories of information protected by law, and, therefore, violate California's anti-gag rule.  Plaintiff brought five PAGA claims (four of which survived Juul's motions to dismiss, *see* Docket No. 42) on behalf of Juul employees and former employees challenging the following aspects of Juul's policies and practices:

          1.     <u>Non-Disclosure and Non-Disparagement Agreements</u>

As an express condition of their employment at Juul, Ms. Hamilton and Mr. Isaacson were required to sign the "Proprietary Information and Invention Assignment Agreement" ("NDA"). FAC ¶ 28.  Their offer letters stated the following: "this offer, and employment pursuant to this offer, is conditioned upon . . . [y]our signed agreement to, and ongoing compliance with, the terms of the enclosed [NDA]," and included a disclaimer that the offer letter is governed by California law.  *Id*.  Plaintiff alleges that Juul has a policy of requiring all of its employees to sign this offer letter (or one that is substantially similar).  *Id*.  The NDA specifically states that its employees "shall at all times during the term of [their] employment with the Company and thereafter, hold in strictest confidence, and not use . . . or disclose to any person, firm, or corporation, without written authorization from the Company's Board of Directors (the 'Board'), any Confidential Information of the Company."  FAC ¶ 29 (citing NDA, Docket No. 32, Ex. A, § 4.1 ("Company Information")).  Plaintiffs alleges that "Confidential Information" is defined by the NDA to mean essentially everything related to Juul (*e.g.*, information about Juul's customers, products, and markets, as well as catch-all terms such as "other business information of the Company" and "information disclosed by the Company to Employee and information developed or learned by Employee during the course of employment with Company").  *Id*. (citing NDA, Docket No. 32, Ex. A, § 4.1 ("Company Information")).

The NDA also contains a non-disparagement provision, which prohibits employees from disclosing "all information of which the unauthorized <u>disclosure could be detrimental to the interests of the Company</u>, whether or not such information is identified as Confidential Information."  FAC ¶ 30 (emphasis in original).  Further, the NDA creates a presumption of confidentiality, stating "Employee agrees that <u>Employee</u> bears the burden of proving that given information or materials are <u>not</u> confidential."  FAC ¶ 31 (emphasis in original).

The NDA contains a direct nexus to the Termination Certificate discussed below because it states that "[i]n the event of the termination of the Employee's employment, Employee hereby covenants and agrees to sign and deliver the 'Termination Certificate' attached hereto as Exhibit C." FAC ¶ 32. Plaintiff alleges it has no temporal or geographic limitation (*i.e.*, it lasts forever and applies whether an employee is on or off Juul's premises), and it contains a provision subjecting it to California law. FAC ¶¶ 34, 35.

       2.   Termination Certificate

On March 15, 2019, Ms. Hamilton was informed that her employment at Juul had been terminated, and Juul required her to sign the "Termination Certificate" that all employees must sign as a condition of employment. FAC ¶ 38. The Certificate requires employees to verify that they have complied with the terms of the NDA, and further states:

> [i]n compliance with the [NDA], I will preserve as confidential all trade secrets, confidential knowledge, data, or other proprietary information, relating to products, processes, know-how, designs, formula, developmental or experimental work, computer programs, data bases, other original works of authorship, customer lists, business plans, financial information or other subject matter pertaining to any business of the Company or any of its employees, clients, consultants, or licensees.

FAC ¶ 38 (emphasis in original). Ms. Hamilton signed the Termination Certificate in compliance with her contractual obligations, and she alleges that other Juul employees have also been required to sign a standard Termination Certificate when leaving employment at Juul. FAC ¶ 39.

       3.   Severance Agreement

The third document at issue is the Severance Agreement (referred to in the FAC as the "Standard Release Agreement"). When Ms. Hamilton's employment was terminated on March 15, 2019, Juul informed her that it would continue to employ her and pay her wages through April 2, 2019 (as well as pay her a bonus), if she signed a Juul Severance Agreement. FAC ¶ 69. This date (April 2, 2019) was significant because it would allow Ms. Hamilton's first tranche of equity to vest. Id. Similarly, when Mr. Isaacson was notified of Juul's intent to terminate his employment in September and early October 2019, Juul offered him continued employment through November 1, 2019 if he signed a release agreement. FAC ¶ 70. Plaintiff alleges that Juul

4

1    requires its employees to sign Severance Agreements that are the same (or similar to) those

2    offered to Ms. Hamilton and Mr. Isaacson (*i.e.*, conditioning continued employment and the

3    payment of wages, bonuses, or other employment benefits on signing the Agreement).  FAC ¶ 72.

4         Juul's Severance Agreements include a general release of claims (including those arising

5    under the Fair Employment & Housing Act, or "FEHA"), and contain another non-disparagement

6    clause, which applies to Juul and "its current and former parents, subsidiaries, related entities and

7    affiliates, and their respective employee benefit plans or funds, officers, directors, shareholders

8    [including Altria, its largest shareholder], partners, employees, agents, trustees, administrators,

9    predecessors, successors, and assigns."  FAC ¶ 74.  Juul's Severance Agreement also requires that

10   employees keep its existence and terms confidential.  FAC ¶ 75.

11        4.    Employment Practices

12        Plaintiff further alleges that, in all-hands meetings and other company-wide

13   communications, Juul's senior executives and lawyers instructed employees both to not speak to

14   the press and to not put anything in writing that could be communicated in person.  FAC ¶ 64.  In

15   addition, Plaintiff alleges that in anticipation of government inspections, Juul Labs trained

16   employees to conceal information from regulators.  FAC ¶ 61.  Employees were allegedly were

17   instructed to not disclose information to inspectors, but rather to direct them to specifically

18   identified individuals.  *Id.* ¶ 62.  These individuals, in turn, were taught to be technically truthful

19   while concealing information from government regulators.  *Id.*  Moreover, Hamilton and Isaacson

20   also allege they were retaliated against for violating the Gag Rules and engaging in internal

21   whistleblowing.  FAC ¶¶ 65-67.

22   C.   Factual Developments Since the Commencement of Proceedings

23        According to Plaintiff (and unopposed by Juul), about a month after Plaintiff filed her

24   complaint, Jull began to use a new NDA for new hires.  Baker Decl. ¶ 2.h, Exh. 8.  The new NDA

25   contains a narrowed definition of "confidential information," a narrowed non-solicitation clause,

26   an express notice of immunity under the Defend Trade Secrets Act, and express carve-outs for

27   "protected activity."  *Id.*  The new NDA also does not require a termination certification. *Id.,* Exh.

28   8.

United States District Court
Northern District of California

5

1       Approximately five weeks after the Court's January 27, 2021 order on Juul's second

2 motion to dismiss, Juul published a 75-page document entitled "Code of Conduct and Global

3 Compliance Policies." Baker Decl. ¶ 2.i, Exh. 9. The new Policies expressly mention the right of

4 Juul employees to engage in "protected activity," which the Code and Policies define as including:

5 (1) "discussing or disclosing terms, wages, or other working conditions (except when the working

6 conditions themselves constitute a trade secret)" and "disclosing information when Juul Labs

7 Personnel have reasonable cause to believe that a violation of or noncompliance with a local, state,

8 or federal rule or regulation has occurred." *Id.*, Exh. 9. The Code and Policies also state: "You

9 are not required to obtain authorization from Juul Labs or to inform Juul Labs prior to engaging in

10 any Protected Activity." *Id.*

11 D.    Procedural History

12       Plaintiff filed this action on June 4, 2020. Docket No. 1. The Court granted Juul's motion

13 to dismiss claims 1-4 without prejudice, and denied the motion to dismiss claims 5-6 in September

14 2020. Docket No. 23. Plaintiff filed an amended complaint, including a seventh cause of action

15 on October 29, 2020. Docket No. 32. The Court granted Juul's motion to dismiss claim 3 and a

16 portion of claim 5 of the FAC with prejudice, but denied the motion to dismiss the remaining

17 claims. Docket Nos. 42, 54. The parties have engaged in extensive discovery, which has included

18 several discovery disputes requiring Court intervention. To date, Jull has produced more than

19 28,000 pages of documents in response to discovery requests and engaged in several round of

20 written discovery. *See* Docket No. 80-1 ("Baker Decl.") ¶ 6.

21       On August 30, 2021, the parties executed a PAGA settlement, assisted by mediator Mark

22 Ruby. Settlement Motion at 10. Plaintiff's unopposed motions for approval of the PAGA

23 settlement and attorneys' fees are now pending. *Id.*; Docket No. 81.

24         **III.**     **SUMMARY OF PROPOSED SETTLEMENT AGREEMENT**

25 A.    PAGA Group Members

26       The settlement resolves Plaintiff's PAGA claims arising from the alleged "Gag Rules" as

27 they relate to Juul's non-Executive, California-based, employees for the Covered Period. Docket

28 No. 80-1, Exh. A ("Settlement") § I.L-M. At the time of the settlement, there were 1,654 such

*United States District Court*
*Northern District of California*

1  employees (*i.e.* "PAGA Group Members"): 1145 former employees and 509 current employees.

2  *Id.* § II.C.

3     In determining whether an employee is California-based, the settlement looks to their

4  residential address during the Covered Period. (*Id.* at § I.P). Because at least some employees –

5  like PAGA Representative Isaacson–reside outside of California but worked pay periods within

6  the State's geographic boundaries, the settlement also creates a 2% reserve fund and a challenge

7  procedure, *id.* § III.F.3-4, for employees who contend they were not properly included as a PAGA

8  Group Member, or that the number of pay periods they worked in California is inaccurate.

9     The Covered Period is from August 10, 2018 through the date of settlement approval.  *Id.* §

10  I.E.  If the final number of PAGA Group Members or pay periods is 10% or more than the

11  numbers provided by Juul at the time of settlement, then the settlement payment will be increased

12  by the amount of the discrepancy.  *Id.* § II.C.

13  B.   Settlement Payment and Plan of Allocation

14     The settlement amount is equal to $34.03 multiplied by the total number of employee pay

15  periods.  Juul represents, and Plaintiff has confirmed, that there are 65,236 total pay periods

16  through August 27, 2021.  *Id*. § III.A.  This means the total settlement amount is $2,219,981.08.

17  That total is also based on a settlement award of $1,000 per employee to redress the PAGA claims

18  under Labor Code §§ 98.6 and 1102.5(a) and a remainder based on per-employee-pay-periods to

19  redress the other PAGA claims.  *Id*. § III.B.2.

20     After any court-approved deductions from the common fund, and consistent with Labor

21  Code § 2699(i), 75% of the settlement amount goes to the California Labor and Workforce

22  Development Agency ("LWDA"), and 25% of the settlement amount goes to the PAGA Group

23  Members.  Settlement § III.B.1-2.  However, the penalty amount attributable to current

24  employees–$956,140.91–will be suspended and forgiven over a two-year period provided Juul

25  Labs substantially complies with the required programmatic relief.  *Id.* § III.B.4.

26     CAC Services, a third-party settlement administrator, will calculate each PAGA Group

27  Member's settlement share, mail the settlement checks, and otherwise administer the settlement.

28  *Id.* at §§ III.E.3, III.F.1; Baker Decl. ¶ 2.m, Exh. 13.  Any deductions from the common fund for

attorney and administrator fees and costs, as well as for service payments to the PAGA

Representatives, are subject to court approval. *Id.* at §§ III.B.3, E.2. CAC has provided a "not-to-

exceed bid" of $8,000 to administer the settlement. Baker Decl. ¶ 2.m.

C.    Programmatic Relief

The settlement requires that former employees receive a court-ordered notice with their

settlement checks. Settlement § III.C.1. The notice states that, notwithstanding any Juul

agreement or policy to the contrary, the employee has the right to engage in specified conduct,

including: (1) the right to whistle blow consistent with Labor Code § 1102.5, Government Code §

12964.5, and the Federal Defend Trade Secrets Act; (2) the right to speak about wages, working

conditions, and political issues consistent with Labor Code §§ 232, 232.5, 1101-02, and 1197.5;

and (3) the right to compete consistent with Business & Professions Code § 16600. *Id.* at Exh. A.

The notice also states: "JUUL LABS WILL NOT RETALIATE AGAINST YOU FOR, NOR

INTERFERE WITH, YOUR EXERCISE OF THESE RIGHTS." *Id.* The notice also explains

each employee's settlement payment and notifies them of the challenge procedure if they believe

their California pay period information is inaccurate. *Id.*

The settlement also requires Juul Labs to modify the agreements, policies and other written

instruments that formerly contained the Gag Rules (to the extent not previously modified) so that

they unambiguously inform Juul's current employees of nine protected activity principles. *See

generally id.* § III.C.2. The express language articulating those principles is as follows:

> a. These instruments do not prohibit or prevent the disclosure of
> information about reasonably suspected violations of the law to
> government agencies or public bodies (as permitted by Labor Code
> § 1102.5) or other third parties (to the extent permitted by
> Government Code § 12964.5), except when the employee's
> knowledge of the information arises solely from communications
> protected from disclosure by Defendant's attorney-client privilege.

> b. These instruments do not prohibit or prevent the disclosure of
> information about reasonably suspected violations of the law,
> internally and in written form, to persons within Defendant's
> organization who have the authority to address the violation.

> c. These instruments do not prohibit or prevent political speech or
> activities, as provided by Labor Code §§ 1101-1102, by employees
> acting in their personal capacities.

8

1

2

       d. These instruments do not prohibit or prevent the disclosure or discussion of their own wages, or the wages of others as permitted by Labor Code §§ 232 and 1197.5(k), but only in a manner consistent with each employee's constitutional right of privacy.

3

4

5

       e. These instruments do not prohibit or prevent the disclosure of information about working conditions, except when that information constitutes a bona fide trade secret or proprietary information of Defendant or is otherwise subject to a legal privilege, consistent with Labor Code § 232.5.

6

7

8

9

       f. These instruments do not prohibit or prevent the disclosure or use of the employee's general skills, knowledge, or acquaintances learned during the course of their employment, nor disclosure or use of information that is readily available to a competitor through lawful competition means. However, the instruments can and do prevent the unlawful use or disclosure of trade secrets and information protected from disclosure by California or federal law.

10

11

       g. Employees have the rights identified in the notice of immunity set forth in the Defend Trade Secrets Act, 18 U.S.C. § 1833(b).

12

13

       h. Employees are not required to give Defendant notice or seek its approval prior to engaging in the protected disclosures or uses permitted in Section III.C.2.a-g.

14

15

16

       i. Employees will not release any claims under the California Fair Employment Housing Act in exchange for a raise, a bonus, or initial or continued employment provided, however, that this does not apply to agreements that fall within an exception to Government Code § 12964.5.

17

*Id.*

18             In addition to modifying the instruments, the settlement also requires Juul to: (a)

19    affirmatively announce the nine principles to its workforce, (b) create and maintain a dedicated

20    webpage setting forth the principles, and (c) not act contrary to the principles. *Id.* § § III.C.3.a.  If

21    Juul Labs communicates with its departed or departing employees about their confidentiality

22    obligations, Juul Labs "shall at the same time provide the employee with a copy of the [nine

23    principles] announcement." *Id.* § III.C.3.b.

24             At six-month intervals during the two-year suspension-and-forgiveness period, Juul must

25    certify under penalty of perjury its ongoing compliance with the nine principles. *Id.* § III.C.4.

26    Any party to the settlement, as well as the LWDA, may bring a motion to enforce the settlement

27    terms. *Id.* at § III.G.6.  There is no time limit or sunset to the modification requirements.

28

United States District Court
Northern District of California

D.      Suspension, Forgiveness and Cure Provisions

If Juul complies with the required programmatic relief, its obligation to pay the penalty amount attributable to *current* employees will be immediately suspended and then forgiven on a monthly basis over a two-year period.  *Id.* at § III.B.4.  However, if, after being given an opportunity to cure, a party moves to enforce the settlement and the Court concludes that Juul Labs has breached its obligations, then the Court may order an appropriate remedy.

Depending on the circumstances, and in the Court's discretion, this remedy may include the payment of some or all of the suspended penalty amount, specific performance, a curative notice to the aggrieved employees, and attorneys' fees.  *Id.* §§ III.C.5, III.G.6.

E.      Settlement Release

In exchange for the settlement benefits, Hamilton and Isaacson, on behalf of themselves, the LWDA, and "to the maximum extent permitted by law, the PAGA Group Members," agree to release the specified PAGA claims that "were or could have been asserted in the Action based upon the factual allegations asserted in the Complaint and/or any PAGA Notice submitted to the LWDA by the PAGA Representatives."  *Id.* § III.D.1.  That release does not extend to non-PAGA claims.  The PAGA Representatives (Hamilton and Isaacson), but not the LWDA or any other PAGA Group Member, also waive their individual rights under Civil Code § 1542 with respect to the released PAGA claims.  *Id.* § III.D.2. The settlement also states that Hamilton releases her non-PAGA claim for a public injunction under the unfair competition law.  *Id.* § III.D.1.

F.      Notification of Proposed Settlement to LWDA and Public

Plaintiff's counsel provided notice to the Labor Workforce and Development Agency through its online filing system of the proposed settlement in this case on September 30, 2021, as well as notice of the moving parties' motion for fees, costs and service payments.  Docket No. 84 ¶ 1, 3.  The proposed settlement and motion for settlement approval was reported in the legal press and made publicly available on counsel's website.  *Id.* ¶¶ 2, 5.  To date, the parties have not received any objections or concerns about the settlement or motions for fees or service awards.  *Id.* ¶ 6.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

# IV.   <u>LEGAL STANDARDS</u>

A.   <u>PAGA Settlement Approval</u>

"An employee bringing a PAGA action does so as the proxy or agent of the state's labor law enforcement agencies, ... who are the real parties in interest." *Sakkab v. Luxottica Retail N. Am. Inc.*, 803 F.3d 425, 435 (9th Cir. 2015) (internal citations omitted).  Thus, "[a]n action brought under the PAGA is a type of qui tam action." *Id.* at 429.  Because a settlement of PAGA claims compromises a claim that could otherwise be brought by the state, the PAGA provides that "court[s] shall review and approve any settlement of any civil action filed pursuant to [PAGA]."  Cal. Labor Code § 2699(1)(2).

A party seeking approval of a PAGA settlement must simultaneously submit the proposed settlement to the California Labor and Workforce Development Agency (LWDA) to allow the LWDA to comment on the settlement if the LWDA so desires.  The PAGA also states that courts may exercise their discretion to lower the amount of civil penalties awarded "if, based on the facts and circumstances of the particular case, to do otherwise would result in an award that is unjust, arbitrary and oppressive, or confiscatory."  Cal. Labor Code § 2699(e)(2).  Because state law enforcement agencies are the "real parties in interest" for PAGA claims, the Court's task in reviewing the settlement is to ensure that the state's interest in enforcing the law is upheld.  *Sakkab*, 803 F.3d at 435.

Other than the provisions discussed above, however, the PAGA does not establish a standard for evaluating PAGA settlements.  Indeed, the LWDA has stated that "[t]he LWDA is not aware of any existing case law establishing a specific benchmark for PAGA settlements, either on their own terms or in relation to the recovery on other claims in the action."  LWDA Response at 3, *O'Connor v. Uber Techns.*, No. 13-CV-03826-EMC, Docket No. 736 (N.D. Cal. July 29, 2016).

Some courts approve PAGA settlements only if "(1) the statutory requirements set forth by PAGA have been satisfied, and (2) the settlement agreement is fair, reasonable, and adequate in view of PAGA's public policy goals." *See Basiliali v. Allegiant Air, LLC*, 2019 WL 8107885, at *3 (C.D. Cal. July 1, 2019) (citations omitted).

Animated by those principles, this Court has previously analyzed the following purposes of

the statute and factors when assessing whether to approve a PAGA settlement:

> (1) Protecting workers and law-abiding employers by ensuring compliance with the State's labor standards and deterring future Labor Code violations;
>
> (2) Collecting civil penalties to augment the State's labor enforcement capabilities and educating workers;
>
> (3) The settlement has a rational basis in view of the strength and full value of the PAGA claims; and
>
> (4) The settlement is neither collusive nor unfair to those affected.

*O'Connor*, 201 F. Supp. 3d at 1132–35.

B.   Attorneys' Fee Awards

In common fund cases, the Court may award reasonable fees using either a percentage-of-recovery or a lodestar multiplier method.  *In re Bluetooth Headset Products Liability Litig.,* 654 F.3d 935, 942 (9th Cir. 2011); *Staton v. Boeing Co.*, 327 F.3d 938, 967-68 (9th Cir. 2003).

Under the percentage-of-recovery method, where there are only state law claims, as there are here, state law also governs the fee award.  *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Cir. 2002).  The benchmark percentage under California law is in the 33% range. *See Chavez v. Netflix, Inc.*, 162 Cal.App.4th 43, 66 n. 11 (2008); *Stuart v. RadioShack Corp.*, 2010 WL 3155645, * 6 (N.D. Cal. Aug. 9, 2010).  The value of injunctive relief is to be included in determining the size of the common fund when the value of that relief can be "accurately ascertained."  *Staton*, 327 F.3d at 974. Even when the value cannot be accurately ascertained, the injunctive relief is still a "relevant circumstance" in determining the fee award.  *Id.*

Under both the percentage-of-recovery and lodestar multiplier methods, the fee can be adjusted either up or down based on factors including: (1) the results achieved; (2) the risks involved in litigation; (3) the skill required and the quality of the work; (4) the contingent nature of the fee; and (5) awards made in similar cases.  *Lazarin v. Pro Unlimited*, *Inc.*, 2013 WL 3541217, *8 (N.D. Cal. July 11, 2013); s*ee also Laffitte v. Robert Half Int'l Inc.*, 1 Cal.5th 480, 489 (2016) (explaining that the lodestar multiplier method allows a court to increase or decrease the lodestar "by applying a positive or negative 'multiplier' to take into account a variety of other factors, including the quality of the representation, the novelty and complexity of the issues, the

United States District Court
Northern District of California

1   results obtained, and the contingent risk presented").

2   C.      Service Awards

3           Service payments to plaintiffs are appropriate in representative litigation, including class

4   cases, derivative cases (where an individual sues on behalf of a legal entity), and PAGA cases

5   (where an individual sues on behalf of the State).  *In re Cellphone Termination Fee Cases,* 186

6   Cal.App.4th 1380, 1383 (2010) (class case); *Barovic v. Ballmer,* 2016 WL 199674, *5 (W.D.

7   Wash. Jan. 13, 2016) (derivative case); *Meza-Morales,* 2020 WL 9718888 *7 (PAGA-only case).

8   Service payments may also be extended to PAGA Representatives who provide material aid to the

9   litigation, execute the settlement, but are not included as a named plaintiff.  *See Guang Tian v. Ma*

10  *Laboratories, Inc.,* 2015 WL 4878980, at *3 (Cal.Super. Aug. 07, 2015) (awarding an incentive

11  payment to a non-party PAGA Representative and explaining "there is authority for providing for

12  incentive payments to non-class representatives").  Service awards are "are intended to

13  compensate class representatives for work done on behalf of the class, to make up for financial or

14  reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness

15  to act as a private attorney general."  *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 958–59 (9th

16  Cir. 2009).

17          Criteria considered when deciding an incentive award include: (1) the risk to the

18  representative; (2) the notoriety and difficulties encountered by the representative; (3) the duration

19  of the litigation; and (4) the personal benefit (or lack thereof).  *Cellphone Termination Fee Cases*,

20  186 Cal.App.4th at 1394-95.

21                              **V.      ANALYSIS**

22  A.      PAGA Settlement Approval

23          In view of the factors relevant to consideration of a PAGA settlement, the Court approves

24  the parties' proposed settlement.

25          1.      Ensuring Compliance with Labor Standards and Deterring Future Violations

26          The programmatic relief established by the settlement addresses and remediates of

27  Plaintiff's surviving claims alleging Juul's present violations of California's anti-gag rule for

28  employees.  *Doe v. Google Inc.*, *supra*, 54 Cal.App.5th at 961.  The issues underlying Plaintiff's

United States District Court
Northern District of California

13

1   PAGA claims were provisions in Juul's NDA, Severance Agreement, Termination Agreement and

2   employment practices that prohibited or discouraged whistleblowing, impeded discussion of

3   working conditions, and unlawfully limited former employees' right to compete.  The

4   programmatic changes, including required notices about employees' relevant rights under

5   California law and changes to the NDA, Severance Agreement and Termination Agreement that

6   ensure conformity with California law address these alleged labor code violations.

7       Furthermore, Juul must certify its ongoing settlement compliance under penalty of perjury

8   over a two-year period.  If Juul fails to comply with its settlement obligations, it risks being

9   required to pay the suspended penalty amount and further court intervention.  Moreover, the

10  settlement provides a financial incentive for Juul to ensure that it continues to comply with the

11  nine principles set forth in the settlement.  If the Court determines that Juul has failed to comply,

12  the aggrieved employees may receive 25% of the suspended settlement amount. The settlement

13  thus provides current employees with a financial incentive to ensure Juul complies with its

14  settlement obligations. And because the settlement only releases claims through the date of

15  settlement approval, Settlement §§ I.E, III.D.1, any subsequent PAGA violation could subject Juul

16  to an entirely new PAGA claim for additional civil penalties. Finally, if a party to the agreement

17  seeks to enforce the settlement and is the prevailing or successful party in connection with such

18  motion, they can seek fees independent and on top of any potential fee award from the common

19  fund.  *Id.* § III.G.6.

20          2.      Collecting Civil Penalties to Augment LWDA Enforcement and Education

21                  Capacities

22      Assuming Juul complies with the programmatic relief, the gross penalty amount

23  immediately due is $1,263,840.17, inclusive of not-yet-determined fees, costs, and service

24  payments.  According to Plaintiff's analysis of settlement and penalty data from the LWDA, this

25  amount is in the 98th percentile of gross PAGA penalties recovered by court approved settlements.

26  Baker Decl. ¶ 2.j, Exh. 10.  If the settlement amount is calculated on a per employee basis (as

27  opposed to a gross or per-pay-period basis), then the recovery is in the 91st  percentile.  *Id.*

28      This Court has approved a $20,000 civil penalty payment (amounting to .15% of the value

United States District Court
Northern District of California

of the PAGA claims) in light of the other benefits of the settlement.  *See Viceral,* 2016 WL

5907869, *9.  The gross penalty amount provided by this settlement–even with the suspension and

forgiveness provisions–enhances the State's labor enforcement and education capabilities.  LWDA

was informed about this proposed settlement on September 30, 2021 and informed about the

currently pending motion for approval of the settlement.  Docket No. 84.  To date, the agency has

not registered an objection to the proposal.  *Id.*

> 3.    Rational Basis in Light of the Full Value of the PAGA Claims

Plaintiff explains that the "undiscounted, fully stacked, value of Plaintiff's surviving

PAGA claims assumes: (1) Liability; (2) $20,000 in civil penalties per employee for the two

PAGA claims under Labor Code §§ 98.6 and 1102.5; (3) $500 per employee pay period for the

initial violation of the five PAGA claims under Labor Code §§ 96(k), 232.5, 432.5, 1101 and

1102; (4) $1,000 per employee pay period for each subsequent violation of these five Labor Code

sections; and (5) no discretionary reduction in penalties."  Motion for Approval at 21.  Based on

these assumptions, Juul's maximum exposure is this:

> Former Employees $59,466,500
>
> Current Employees $38,022,500
>
> **Total $97,489,000**

Baker Decl. ¶ 8.

Thus, the settlement, for $2.22M, results in a recovery of about 2.2% of the maximum

exposure if Juul Labs does not comply with the programmatic relief, and about 1.3% of the

maximum exposure if Juul does comply.

Plaintiff acknowledges "that many of the assumptions [of the full value of the case] rest on

unresolved legal and factual issues" and, "as a result, the actual case value is less than the

maximum exposure."  Motion for Approval at 22; Baker Decl. ¶ 9.

For example, Plaintiff's maximum exposure analysis assumes the stacking of penalties by

Labor Code section.  *See O'Conner v. Uber Technologies*, 2016 WL 3548370, *7 (N.D. Cal. June

30, 2016) (stating that the parties should not ignore stacking when calculating PAGA penalties).

However, this assumption is subject to challenge.  *E.g.*, *Snow v. United Parcel Services, Inc.*, 2020

United States District Court
Northern District of California

1   WL 1638250, *3 (C.D. Cal April 1, 2020) ("plaintiffs may only recover a set of civil penalties for

2   each type of violation."); *Salazar v. PODS Enterprise, LLC*, 2019 WL 2023726, *6 (C.D. Cal.

3   May 8, 2019) ("it is possible (although highly unlikely) that [plaintiff] could recover PAGA

4   penalties for each separate type of Labor Code violation"); *Smith v. Lux Retail North America*,

5   2013 WL 2932243, *4 (N.D. Cal. June 13, 2013) (questioning whether it was "really plausible that

6   we would pile one penalty on another for a single substantive wrong").  Plaintiff explains that "if

7   PAGA penalties are stacked by cause of action (and not by Labor Code section), then the

8   maximum exposure drops to $71,725,400" and if, as Juul Labs contends, "the PAGA penalties

9   cannot be stacked at all, then the exposure drops" to $12,881,800.  Motion for Approval at 22.

10          Juul also argues that it cannot face a "subsequent" violation under PAGA's default penalty

11   provision – resulting in a $200 per pay period penalty -- without first being found liable for an

12   "initial" violation.  *See Steenhuyse v. UBS Financial Services, Inc.*, 317 F.Supp.3d 1062, 1067-68

13   (N.D. Cal. 2018).  If Juul Labs is correct that: (1) the penalties in this case cannot be stacked, and

14   (2) it cannot be held liable for "subsequent" violations under the default penalty provision, then

15   the exposure drops to $6,523,600.  Motion for Approval at 22.

16          Moreover, the mandatory award of civil penalties may be appropriately reduced as

17   "unjust" when the employer, upon learning of the legal violations, acts to correct them.  *E.g.,*

18   *Magadia v. Wal-Mart Associates, Inc.,* 384 F.Supp.3d 1058, 1104 (N.D. Cal. 2019) (80%

19   reduction in PAGA penalties where the amount requested by the plaintiffs "would be unjust and

20   oppressive, and . . . a significant reduction is appropriate [because] California courts have held that

21   a defendant's attempt to comply with the law is a basis for reduction in a PAGA penalties award").

22   Here, the evidence suggests that Juul Labs began using a new NDA after Plaintiff filed suit, and

23   implemented a new Code and Policies after the Court ruled on Juul's second motion to dismiss.

24   Motion for Approval at 23; Baker Decl. ¶¶ 2.h-i, 9.  These may be further grounds upon which a

25   finding of liability in this case, may, nonetheless, have resulted in a reduced amount of damages as

26   compared to the potential maximum value of the case.

27          Finally, a primary component of this settlement is programmatic relief, akin to injunctive

28   relief that could have been ordered by the Court.  The parties do not place a monetary value on the

United States District Court
Northern District of California

16

programmatic relief here.  But the programming is significant and are directly responsive to addressing the allegations of unlawful conduct that were central to the claims in the case.  The settlement provides immediate relief to the aggrieved employees and former employees, and potentially benefits the public.  It remediates the alleged present violations and provides notice to current and former employees of important rights.  The settlement notifies more than a thousand employees that their NDAs do not prevent them from exercising the rights provided by California's anti-gag rule, including the right to whistle blow and speak.  And, the programmatic relief requires Juul to provide updates on its compliance with the terms of the settlement in six-month intervals over the course of two years.  There is no time limit or sunset on the terms of the settlement agreement and the Court retains jurisdiction over the agreement, which means that beyond the two year compliance period, JUUL employees may bring actions against the company to enforcement the settlement agreement.

This Court is skeptical of deeply discounted PAGA settlements.  It has rejected a proposed resolution of PAGA claims for 0.1% of the maximum PAGA exposure.  *O'Connor*, 201 F.Supp.3d 1110, 1135 (N.D. Cal. 2016).  But, it has approved the settlement of PAGA claims for as low as 0.15% of their maximum value where, among other things, the settlement taken as a whole vindicates employee rights and may have a deterrent effect on the defendant employer and others.  *Viceral v. Mistras Group, Inc.,* 2016 WL 5907869, * 9 (N.D. Cal. Oct. 11, 2016).  In light of the robust programmatic relief provided by this settlement, the Court can reasonably conclude that the purposes of PAGA are likewise advanced here.

Moreover, this case, where all but one of the claims is a PAGA claim, does *not* present the risk of cases where PAGA claims are brought in conjunction with class claims, such that "there may be a temptation to include a PAGA claim in a lawsuit to be used *merely* as a bargaining chip, wherein the rights of individuals who may not even be members of the class and the public may be waived for little additional consideration in order to induce the employer to agree to a settlement with the class." *O'Connor*, 201 F. Supp. 3d at 1134 (emphasis added).  Rather, by contrast, the PAGA claims here are not bargaining chips, but are the case itself; resolution of the PAGA claims in this case dissolves the entire case, because the settlement agreement requires Plaintiff Hamilton

to release the only other claim in the case – a claim for public injunctive relief under California's unfair competition law.

It is worth observing, as well, that the PAGA claims in this case do not involve ordinary wage-and-hour violations – the traditional subject of PAGA claims – but rather relate to alleged violations of working conditions that are harder to quantify and less commonly litigated.  Indeed, the surviving claims in this case are based on a theoretical chilling effect on employee or former employee speech rather than tangible monetary harms like lost wages.  In fact, to date in the litigation, Plaintiffs have not shown that anyone was actually harmed or stopped from speaking by Juul's policies which they challenge.  The programmatic relief in the settlement redresses the theoretical harm that is central to Plaintiff's case, and the monetary award goes even further to penalize Juul for theoretical past harms.  Plaintiff identifies four settlements of PAGA claims concerning allegedly unlawful gag rules, three of which were negotiated in by Plaintiff's counsel. Motion for Approval at 23.  Plaintiff summarizes those settlements in the following chart:

| Case | Amount Per Pay Period | Programmatic Relief | Status |
|---|---|---|---|
| *Lai v. Binary Capital Management,* Case No. 17-CIV-02882 (San Mateo Superior Court, 2020). | @ $500 per pay period (nine PAGA Group Members). | Injunctive relief preventing enforcement of NDAs and notice to the PAGA group members. | Settlement approved |
| *Rosetta v. Paycom*, Case No. 2:19-cv-8994-AS (C.D. Cal. 2021). | @ $80 per pay period (about 225 PAGA Group Members) | Programmatic relief including revisions to agreements and policies so that they comply with the law, an agreement to not enforce NDAs in a manner contrary to California law, and notice to the PAGA members. | Settlement (which includes class claims) granted preliminary approval. |

United States District Court
Northern District of California

| Case | Amount Per Pay Period | Programmatic Relief | Status |
|---|---|---|---|
| ***Hamilton v. Juul Labs*** **(the present case)** | **@ $34.00 per pay period (1654 PAGA Group Members)** | **Extensive programmatic relief obligations, including notice to PAGA group members** | **Settlement before this Court** |
| *Moniz v. Adecco*, Case No. 17-CIV-01736 (San Mateo Superior Court, 2020) (appeal pending). | No pay period data, but per employee penalty is either $630 (for permanent employees) or $41 (for temporary employees). | Notice to PAGA group members and agreement to revise gag rules in undetermined way at an undetermined time. | Settlement approved over the objections of the LWDA and an aggrieved employee. Appeal pending. |

The chart demonstrates that the settlement here affects a significantly larger number of employees than in similar cases. As a result, the programmatic relief here is more extensive in terms of the scope of its reach than the programmatic relief in those cases. However, the per employee settlement payment amount is less than those obtained in at least two cases—although, in at least one of those cases, the PAGA claims were settled as part of a global settlement which included settlement of class claims and PAGA related to worker misclassification, as well as PAGA claims related to unlawful restrictions on speech, *see Rosetta v. Paycom*, Case No. 2:19-cv-8994-AS, Docket No. 62 (C.D. Cal. July 8, 2021). Nonetheless, the gross penalty amount places this case above the 90th percentile for PAGA settlements. Baker Decl. ¶ 2.j, Exh. 10.

In light of the unique circumstances present here, the Court should find that the settlement proposal has a rational basis when examining the amount of penalties measured against the litigation risk in the case, as well as the programmatic relief directly responsive to the claims in the case and in furtherance of the protection of the rights of workers.

    4.    <u>Settlement is Neither Collusive Nor Unfair</u>

This Court has noted that when reviewing a class settlement for preliminary approval, "the Court must be especially sensitive to the risk of collusion or a less than full adversarial process

United States District Court
Northern District of California

1   where claims pending in other lawsuits are released for minimal value, in order to induce the

2   defendant to settle *this* case." *O'Connor*, 201 F. Supp. 3d at 1121.  Here, there is no indication

3   that any other cases are affected by the settlement here, and the settlement does not preclude

4   employees from enforcing the terms of the programmatic relief here or bringing PAGA claims in a

5   suit for future violations by Juul.  Moreover, this settlement was reached after the parties litigated

6   two motions to dismiss and conducted extensive discovery.

7          Finally, the settlement provides benefits to former employees—in the form of notices in

8   the form notices informing them of their rights to whistleblow and a share of civil penalties—as

9   well as to current employees—Juul's adherence to California law regarding anti-gag rules, and, if

10  Juul fails to live up to that commitment, the opportunity to seek monetary penalties.

11         In summary, the Court approves the PAGA settlement, Docket No. 80, because it

12  remediates Juul's alleged violations of the California labor code of PAGA, supports the LDWA in

13  its enforcement work, is rationally grounded in the valuation of the case, and is neither collusive

14  nor unfair.

15  B.     Attorneys' Fee Award

16         The settlement sum in this case is at least $2,219,981.08. Of this amount, $1,263,840.17

17  will be paid immediately and the remainder, or $956,140.91, will be paid if Juul does not comply

18  with its injunctive relief obligations to current employees.  Because the minimum value of the

19  injunctive relief can be accurately ascertained (it is at least $956,140.91), that sum is included in

20  determining the size of the common fund for fee purposes.  *Staton*, 327 F.3d at 974.[1]  Under

21  federal law, the 25% benchmark under the percentage-of-recovery method results in a fee award

22  of $554,995.30.  Accordingly, Plaintiff's counsel requests $555,000 in attorneys' fees.  Docket

23  No. 81 ("Fees Motion") at 20.

24         Additionally, Plaintiff's counsel explains that a $555,000 fee award is consistent with a

25  lodestar calculation of fees increased by a 1.25239 multiplier (approximately 1.25).  Counsel

26

27  _____

28  [1] The full value of the injunctive relief is likely significantly greater than $956,000 because, as previously discussed, the programmatic relief is directly responsive and wide-ranging in redressing the theoretical harms to speech that Plaintiff's alleged.

United States District Court
Northern District of California

documented 540.30 hours of work in this case at an hourly attorney rate ranging from $495 to $875, amounting to a lodestar amount of $443,152.50.  Docket No. 81-3 ¶ 4, 8-13, 22.  Plaintiff's counsel rates are reasonable, in light of the finding affirmed in *Lafitte v. Robert Half Internat, Inc.,* that in 2009 hourly rates ranged from $775 to $950 an hour with respect to complex employment matters in California.  180 Cal. Rptr. 3d 136, 152 (Ct. App. 2014), *aff'd*, 1 Cal. 5th 480, 376 P.3d 672 (2016).

In light of the strong results achieved in this case which benefit PAGA members and advance the goals of PAGA, the risks of litigation, the contingent nature of the case (in which Plaintiff's counsel advanced all cost), the novel legal claims, and the fact that counsel's fee request is consistent with the 25% federal benchmark and the 1.25 multiplier for the lodestar method is reasonable, *see Lazarin v. Pro Unlimited, Inc*., No. C11-03609 HRL, 2013 WL 3541217, at *8 (N.D. Cal. July 11, 2013) ("Multiples ranging from one to four frequently are awarded in common fund cases when the lodestar method is applied.") (quoting 4 Newberg on Class Actions § 14:6 (4th ed.), the Court approves Plaintiff's request for attorneys' fees.

1.    Costs

Plaintiff's counsel incurred litigations costs in the amount of $22,721.00. These costs are mostly related to ESI storage and experts.  Docket No. 81-3, Exh. 2.  It is appropriate for the State and the PAGA Group Members to collectively share the cost of litigating this matter.  *In re Omnivision Technologies, Inc.*, 559 F.Supp.2d 1036 (N.D. Cal. 2008) ("Attorneys may recover their reasonable expenses that would typically be billed to paying clients in non-contingency matters."); *In re Media Vision Tech. Sec. Litig.*, 913 F.Supp. 1362, 1366 (N.D. Cal. 1996) ("Reasonable costs and expenses incurred by an attorney who creates or preserves a common fund are reimbursed proportionally by those class members who benefit by the settlement.").  The Court should grant Plaintiff's request for costs.

C.    Service Awards

Plaintiff Hamilton and PAGA Representative Isaacson each request service awards keyed at 1% of the settlement amount, or $22,000 per person.  In assessing whether to award the requested service fees, the Court may consider (1) the risk to the representative; (2) the notoriety

21

1    and difficulties encountered by the representative; (3) the duration of the litigation; and (4) the

2    personal benefit (or lack thereof).  *Cellphone Termination Fee Cases*, 186 Cal.App.4th at 1394-95.

3             Plaintiff Hamilton explains that she resolved in individual claims against Juul shortly after

4    her termination, but did not release her right to bring a PAGA case or claim in order to ensure that

5    whistleblowers at the company and formerly employed by the company were protected.  Docket

6    83-1 ¶¶ 3-4.  She discussed the challenges of the choice to take on a wealthy tobacco company, in

7    violation of the Release NDA, and to litigate these claims for two years.  *Id.* ¶ 4.  She spent over

8    60 hours working on the case and participated in reviewing the settlement and filings.  *Id.* ¶ 7.

9    PAGA Representative Isaacson violated his NDA to support Plaintiff Hamilton and participate in

10   this case after his termination from Juul and spent 20 hours working on the case.  Docket No. 81-2

11   ¶¶ 4-7.  As a former employees, Hamilton and Isaacson stand to obtain the same share as all other

12   1,144 former employee who will receive a portion of the 25% of the penalties that are allocated to

13   them.  Docket No. 80-2 at 46.

14            In support of Plaintiff's request for services awards, Plaintiff explains that PAGA was

15   enacted because "the lack of government resources to enforce the Labor Code led to a legislative

16   choice to deputize and incentivize employees uniquely positioned to detect and prosecute such

17   violations through PAGA."  *Iskanian v. CLS Transportation Los Angeles*, 59 Cal.4th 348, 390

18   (2016).  Plaintiff argues that although a 25% share of civil penalties would clearly be sufficient

19   incentive if the PAGA representatives collected *the entire 25%*, that is not how PAGA has been

20   construed.  *Id.* at 382 (stating that, under PAGA "a portion of the penalty goes not only to the

21   citizen bringing the suit but to all employees affected by the Labor Code violation.").  Thus,

22   Plaintiff contends that absent the possibility of a substantial incentive payment, few employees

23   would be willing to step forward and a small service payment would not serve to "incentivize

24   employees uniquely positioned to detect and prosecute such violations through PAGA."  Fee

25   Motion at 13.

26            Plaintiff's arguments for $22,000 services awards ignores decisions that such a request is

27   inappropriate because it is more than "four times the amount that is deemed presumptively

28   reasonable in this District."  *Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245, 267 (N.D. Cal.

United States District Court
Northern District of California

1    2015); *id.* at 266-67 ("A class representative must justify an incentive award through evidence

2    demonstrating the quality of plaintiff's representative service such as substantial efforts taken as

3    class representative to justify the discrepancy between [his] award and those of the unnamed

4    plaintiffs. Incentive awards typically range from $2,000 to $10,000.") (quotation and citation

5    marks omitted).  Additionally, Plaintiff's framing of modesty by seeking 1% of the settlement is

6    not supported by the decisions of other courts.  *See Sandoval v. Tharaldson Emp. Mgmt., Inc.,* No.

7    EDCV 08–482–VAP (OPx), 2010 WL 248346, at *10 (C.D. Cal. June 15, 2010) (collecting cases

8    and concluding that plaintiff's request for an incentive award representing one percent of the

9    settlement fund was excessive).

10          Courts may grant service awards beyond the presumptively reasonable amount of $5,000 if

11   the circumstances so warrant.  In *Bellinghausen,* the court rejected Plaintiff's request for a $15,000

12   incentive award but approved a $10,000 incentive award based on Plaintiff's decisions to put the

13   claims of the class above his, participating in 1 year and 9 months of litigation, and working 73

14   hours in the case which involved travel and participation in mediation and settlement.  306 F.R.D.

15   at 267.

16          Applying these principles here, the Court grants Plaintiff Hamilton and Representative

17   Isaacson service awards of $10,000 each.  The Court finds that this amount, which is more than

18   the presumptively reasonable amount, is warranted for Plaintiff Hamilton because she pursued

19   PAGA claims rather than bargaining them away when settling her individual claims and because

20   she committed 60 hours of work in the case over nearly two years, including attending mediation

21   and settlement conferences, and participation in discovery.  Docket No. 81-1 ¶¶ 4-7.  Hamilton

22   exposed herself to significant stress by suing a well-heeled tobacco company.  And PAGA

23   Representative Isaacson exposed himself to the risk of being sued or subjected to a counterclaim

24   by Juul because he violated the terms of the NDA in his termination agreement by participating in

25   this case.  Docket No. 81-2 ¶¶ 4-7.  Moreover, employees and former employees face potential

26   risks in the labor market when they bring suit against their employer or former employer.  Thus,

27   the Court approves service awards for Hamilton and Isaacson in the amount of $10,000 each.

28

United States District Court
Northern District of California

23

**VI.      CONCLUSION**

For the foregoing reasons, the Court **GRANTS** Plaintiff's motion to approve settlement, Docket No. 80, and Plaintiff's motion for fees and awards, Docket No. 81.

This order disposes of Docket Nos. 80 and 81.  The Clerk is directed to enter the accompanying judgment and close this case.

**IT IS SO ORDERED**.

Dated: November 16, 2021

_____
EDWARD M. CHEN
United States District Judge